David B. Rosenbaum, 009819
Hayleigh S. Crawford, 032326
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
hcrawford@omlaw.com

R. Stanton Jones, *pro hac vice pending*
Robert N. Weiner, *pro hac vice to be filed*
Sally L. Pei, *admitted pro hac vice*
Daniel F. Jacobson, *pro hac vice to be filed*
Emily Chertoff, *pro hac vice to be filed*\*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
stanton.jones@arnoldporter.com
robert.weiner@arnoldporter.com
sally.pei@arnoldporter.com
daniel.jacobson@arnoldporter.com
emily.chertoff@arnoldporter.com
*\*Admitted only in New York, practicing law in
the District of Columbia under the supervision
of Firm principals who are D.C. Bar members.*

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Yazmin Juárez Coyoy, on her own behalf and as a surviving parent of M.J., <br><br> Plaintiff, <br><br> v. <br><br> City of Eloy, Arizona, <br><br> Defendant. | No. CV-19-01391-PHX-JJT (JFM) <br><br> **COMPLAINT - REDACTED** <br><br> (Jury Trial Demanded) |

**INTRODUCTION**

1.      This action seeks to hold the City of Eloy accountable for its role in the painful and preventable death of a 21-month-old child.  For a substantial annual fee, Eloy assumed legal responsibility to oversee the nation's largest immigration detention facility in Dilley, Texas, and its treatment of the immigrant families and children jailed there.  Yet, for years, Eloy negligently and recklessly ignored its subcontractor's gross failures to provide safe and humane conditions and to ensure minimally adequate medical services for the thousands of immigrants supposedly under its care.  Based on extensive publicly available information, Eloy knew or should have known that unsafe conditions and woefully inadequate medical care at Dilley threatened the health and lives of people detained there, especially small children, yet Eloy took no action—none at all—to prevent the sickness and death of those innocent children.  Inevitably, Eloy's dereliction of duty resulted in this tragedy.

2.      In 2014, Eloy entered into a highly irregular contract with U.S. Immigration and Customs Enforcement ("ICE"), choreographed by CoreCivic, the second-largest private prison company in the United States.  At that time, Eloy already was operating an adult immigration detention facility located in Eloy under an Inter-Governmental Service Agreement with ICE, with CoreCivic running the Eloy detention facility as a subcontractor to the City.  Eloy agreed to tack on to its existing agreement with ICE the construction and operation of a new, 2,400-bed immigration detention center for families and children, 900 miles away in Dilley, Texas.  Eloy then subcontracted CoreCivic to own and operate the new Dilley detention facility.

3.      This contrivance allowed ICE and CoreCivic to circumvent the rigorous federal procurement processes that such a venture—building and operating a massive detention facility—would normally entail.  The Department of Homeland Security Office of the Inspector General later deemed this arrangement improper, cautioning that ICE had "no assurance that it executed detention center contracts in the best interest of the Federal Government, taxpayers, or detainees."  Indeed it did not.

4.     With no involvement in the negotiations between ICE and CoreCivic, and no meaningful deliberation or investigation regarding the terms of this arrangement, Eloy agreed to serve as a middleman for ICE and CoreCivic.  For its willingness to join in this scheme, Eloy received an annual fee of $438,000.

5.     Over a period of years, despite its legal responsibility for the proper operation of Dilley and well-being of immigrant families and children jailed there, and despite widespread reports of abysmal conditions and detainee deaths at other CoreCivic facilities (including the adult immigration detention facility located in the City of Eloy), Eloy never bothered to take even modest steps to monitor conditions at Dilley, or to exercise even the slightest supervision over the facility and treatment of the people there.  Instead, Eloy pocketed hundreds of thousands of federal taxpayer dollars each year for doing nothing, allowing a growing chorus of concerns about unsafe detention conditions and woefully substandard medical care at Dilley to go entirely unaddressed.  With no regard for the families and children detained at Dilley, Eloy left a profit-making company, CoreCivic, free to cut whatever corners it wanted. And CoreCivic took full advantage, for years pocketing tens of millions of dollars in excessive, windfall corporate profits at the expense of children's basic safety.

6.     In early 2018, with no inkling of the horrific conditions they would soon face, Yazmin Juárez Coyoy and her then-18-month-old daughter M.J. fled their home in Guatemala and ultimately crossed the Rio Grande into southern Texas, hoping to find safe refuge in the United States, where Ms. Juárez's mother already lived.  U.S. Customs and Border Patrol promptly took Ms. Juárez and M.J. into custody and transferred them several days later to Dilley.

7.     M.J. was a perfectly healthy child when she arrived at Dilley.  She had never had any serious or chronic medical condition of any kind.  But during their roughly three weeks in detention at Dilley, Ms. Juárez and young M.J. were forced to live in close quarters with many other children who were very sick.  Within days, M.J. began showing symptoms of a treatable respiratory illness.

8.    Over the next two weeks, as M.J.'s condition worsened, Ms. Juárez made repeated and increasingly desperate attempts to seek treatment from the Dilley medical staff.  M.J. got sicker and sicker, progressing from a cough and runny nose, to a 104º fever, constant diarrhea and vomiting, rapid weight loss, a depressed blood oxygen level, and increased heart rate.

9.    At least twice, Ms. Juárez and M.J. waited hours to be seen by clinic staff, only to be turned away at the close of working hours without treatment.  And when clinic staff did see M.J., the examinations were cursory and the treatments fell far below the standard of care.  This was not merely an error in medical judgment.  It was active neglect of a very sick child.

10.    M.J.'s condition continued to deteriorate over the rest of her time at Dilley.  Clinic staff finally told Ms. Juárez that M.J. would be referred to a medical provider, but M.J. in fact never saw such a provider.  Instead, ICE released Ms. Juarez and M.J. and cleared them to travel on a commercial airline flight to New Jersey a day later.  The medical record clearing M.J. for release and travel was prepared by a licensed vocational nurse, who was not qualified under state law to provide a medical evaluation or clearance.  The vocational nurse wrote on the form that M.J. did not have any relevant medical issues, but the vocational nurse never even saw M.J.  In fact, M.J. was very sick when she was released from Dilley, and clearing her for air travel placed her in grave medical risk.  Indeed, within one day after her release from ICE custody, after arising in New Jersey, M.J. was admitted to a local hospital's pediatric intensive care unit.  By that time, she was in acute respiratory distress with a critically low blood oxygen level.

11.    During the last weeks of her short life, M.J. was transferred to two additional hospitals for increasingly specialized care, enduring agonizing treatments and never leaving intensive care.  M.J. died on May 10, 2018.  On the day her daughter died, Ms. Juárez left the hospital with only an ink print of M.J.'s right hand, made the previous day as a Mother's Day gift.

4

12.   By failing to exercise supervision, and in particular, by failing to provide or ensure safe and sanitary conditions appropriate for small children or even minimally adequate medical care at Dilley, Eloy exacerbated the harms caused by family detention.  Under Eloy's watch, many families and children at Dilley suffered from untreated illnesses and other serious medical conditions.  These conditions are inherently unsafe and endangered the health and lives of all the people detained there, especially small children like M.J.

13.   As a result of the City of Eloy's recklessness, negligence, and callous inattention to the well-being of families and children detained at Dilley, Ms. Juárez has suffered the unimaginable grief of losing her only child.  Eloy must be held to account for M.J.'s wrongful and preventable death, and for the severe mental pain, distress, loss of love and companionship, and other harms inflicted on Ms. Juárez.

**JURISDICTION AND VENUE**

14.   This Court has diversity jurisdiction under 28 U.S.C. § 1332.

15.   Plaintiff Yazmin Juárez Coyoy is a native of Guatemala residing in New Jersey.

16.   Defendant City of Eloy is a political subdivision of the State of Arizona.

17.   The amount in controversy exceeds $75,000.

18.   Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because Defendant is an entity of Pinal County, Arizona, the county in which a substantial part of the events giving rise to the claim occurred.  Venue is proper in the Phoenix Division of this Court pursuant to LRCiv 77.1(c).

19.   On August 28, 2018, Plaintiff submitted a notice of claim to Defendant in accordance with A.R.S. § 12-821.01.

20.   Under A.R.S. § 12-821.01(E), Defendant is deemed to have denied Plaintiff's claim by failing to respond within sixty days after its submission.

**PARTIES**

21.    M.J., a native of Guatemala, was 21 months old when she died on May 10, 2018, as a result of respiratory illnesses she contracted while detained with her mother at the South Texas Family Residential Center, an immigration detention facility for families, including children, in Dilley, Texas.

22.    Plaintiff Yazmin Juárez Coyoy is the surviving mother of M.J. and was detained with M.J. at the Dilley detention facility.  Ms. Juárez currently resides in Plainfield, New Jersey.

23.    Defendant City of Eloy is a legal and political municipal corporation existing under the laws of the State of Arizona and is subject to suit under Arizona Revised Statutes § 12-821.01.  At all relevant times, through its agreement with ICE, Eloy was the contractor responsible for operation of the Dilley detention facility.

**STATEMENT OF FACTS**

**A. The City of Eloy Signs a Highly Irregular and Lucrative Contract with ICE and CoreCivic to Manage the Massive Family Detention Center in Dilley, Texas.**

24.    Beginning in 2013 and 2014, thousands of families and unaccompanied children fled their homes in Central America's Northern Triangle region—Honduras, Guatemala, and El Salvador—journeying north to the United States to seek refuge from violence and persecution.

25.    To manage this wave of migration, the U.S. government hastily created several new detention centers to house the increasing numbers of children and families apprehended along the United States' Southwest border.  One such detention center was the 2,400-bed South Texas Family Residential Center, located in Dilley, Texas ("Dilley").

26.    ICE tapped a corporation then known as Corrections Corporation of America or "CCA" (now known as CoreCivic)—the nation's second-largest private,

for-profit prison company—to quickly assume some of the risks of building and operating the Dilley facility.

27.     In 2009, the U.S. government had decided to close a different family detention center run by CoreCivic because of serious concerns about its operation and detention conditions.  Nevertheless, ICE deemed CoreCivic a suitable contractor and negotiated a four-year, $1 billion deal for CoreCivic to build and operate the new Dilley detention facility.

28.     Ordinarily, the federal government awards contracts of this nature only after a formal procurement process, highly regulated to maximize competition among potential vendors and enable public and private oversight.  Citing the significant delay this thorough process would entail, ICE instead devised a workaround allowing work to begin without a federal procurement process.

29.     The workaround relied on a 2006 Inter-Governmental Service Agreement ("IGSA") between ICE and the City of Eloy.  Under the 2006 IGSA, the City was responsible for the operation of a detention facility located in Eloy for up to 1,500 adult immigration detainees.  Eloy subcontracted with CoreCivic, which owns and operates the facility, to provide minimum- and medium-security housing for adult male and female detainees in accordance with the 2006 IGSA.

30.     Instead of a new contract that would trigger procurement statutes and regulations, ICE and CoreCivic negotiated a modification to Eloy's IGSA, permitting CoreCivic to construct and operate the Dilley facility, 900 miles away from Eloy. CoreCivic, as a subcontractor to Eloy, would own and operate Dilley, while Eloy would retain legal responsibility and supervisory authority for the operation of the facility and well-being of the detainees there.

31.     ICE's Commercial and Administrative Law Division (within the Office of the Principal Legal Advisor) advised ICE that the proposed modification was probably illegal, because, among other things, the proposed changes relating to the

new Dilley detention facility were likely outside the scope of the original IGSA, which was for adult detention only.

32.   Despite this advice to ICE, on September 22, 2014, CoreCivic officials met with Eloy's City Council to request that Eloy modify its existing IGSA according to the terms that CoreCivic and ICE had negotiated.

33.   For its contrived role as the middleman between ICE and CoreCivic purportedly overseeing the construction and operation of the Dilley facility, Eloy would collect about $438,000 in annual fees under the IGSA modification.  This fee was nearly five times the fee Eloy collects for the ICE detention facility located in the city, which CoreCivic also operates.[1]

34.   Eloy did not participate in any of the negotiations related to the Dilley facility and had no input regarding the proposed IGSA modification.  Nevertheless, Eloy signed on.

35.   ICE executed the IGSA modification on September 23, 2014, the day after meeting with CoreCivic, which was not identified as a party to the agreement. Eloy then subcontracted with CoreCivic to provide detention services at Dilley for up to 48 months.

36.   Eloy entered into this new arrangement even though the CoreCivic facility in Eloy holds the record for the most detainee deaths at a single immigration detention center in the United States.[2]

37.   The modified IGSA between Eloy and ICE set numerous detailed requirements for the operation of the Dilley detention facility, including requirements

---

[1] Tanner Clinch, *Texas Prison Is Big Business for Eloy*, Casa Grande Dispatch (July 4, 2016), https://www.pinalcentral.com/casa_grande_dispatch/area_news/texas-prison-is-big-business-for-eloy/article_393cc0aa-40dd-11e6-9c6a-0fd59f6a0106.html.
[2] *See Systemic Indifference: Dangerous & Substandard Medical Care in U.S. Immigration Detention*, Human Rts. Watch (May 8, 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention.

for services to be provided to detainees. The stated purpose was "to sustain a program of temporary shelter in a safe and secure environment."[3]

38. The agreement also set forth detailed requirements for medical and dental care, stating: "The Service Provider [Eloy] will provide a medical and dental facility adequately sized to the population of the Center and will provide all medical, dental, and mental health equipment and supplies. The Service Provider will maintain medical facilities and all medical equipment in good working condition and ensure adequate stocks of medical supplies are maintained. A detailed list of required medical equipment and supplies is incorporated as an appendix to this agreement. The Service Provider will provide residents access to medical services in the medical facility 24 hours per day, 7 days per week, and will provide security staffing for the medical facility. The Service Provider shall provide twenty-four (24) hour transportation for off-site medical referrals."

39. The modified IGSA further stated: "All residential staff employed by the Service Provider shall meet the FRS requirements for First Aid and Medical Emergencies, including being trained initially and annually on how to respond to health-related emergencies, administering first aid and CPR, and obtaining emergency medical assistance."

40. The contract explicitly imposed responsibility on the City of Eloy for supervising the Dilley facility and making sure its operation complied with these terms: "ICE's Quality Assurance Surveillance Plan (QASP) is based on the premise that the Service Provider [Eloy], and not the Government, is responsible for the day-to-day operation of the Facility and all the management and quality control actions required to meet the terms of the Agreement. The role of the Government in quality assurance is to ensure performance standards are achieved and maintained. The

---

[3] South Texas Family Residential Center Performance Work Statement at 1, *in* South Texas Family Residential Center City of Eloy IGSA Modification (Sept. 15, 2014), https://www.ice.gov/doclib/foia/contracts/south_texas_family_residential_center_city _of_eloy_igsa_modification.pdf.

Service Provider shall develop a comprehensive program of inspections and monitoring actions and document its approach in a Quality Control Plan (QCP)." (Emphases added).

41.     On February 21, 2018, the DHS Office of Inspector General published a report highly critical of ICE, finding that the 2014 modification of the ICE-Eloy IGSA was inappropriate and undermined accountability.  The Inspector General determined that "[a]lthough ICE could have contracted directly with the private company that operates the South Texas Family Residential Center, CCA [CoreCivic], it instead created an unnecessary 'middleman' by modifying its existing IGSA with Eloy."

42.     CoreCivic has reaped enormous profits from the Dilley facility.  Dilley was just one of 74 facilities operated by CoreCivic, but the Dilley contract with ICE, channeled through Eloy, generated 14% of CoreCivic's business profits.[4]

43.     In its 2018 10-K filing, CoreCivic disclosed that:

> During the years ended December 31, 2017 and 2016, we recognized $170.6 million and $267.3 million, respectively, in total revenue associated with the South Texas Family Residential Center. The original IGSA with ICE had a favorable impact on the revenue and net operating income of our owned and managed facilities during 2016, with more favorable operating margin percentages than those of our average owned and managed facilities.[5]

44.     In 2016, ICE renegotiated the Eloy IGSA modification to cut costs, resulting in a decline in revenue for CoreCivic.  As CoreCivic explained in its 2018 10-K:

---

[4] Chico Harlan, *Inside the Administration's $1 Billion Deal to Detain Central American Asylum Seekers*, Wash. Post (Aug. 14, 2016), https://www.washingtonpost.com/business/economy/inside-the-administrations-1-billion-deal-to-detain-central-american-asylum-seekers/2016/08/14/e47f1960-5819-11e6-9aee-8075993d73a2_story.html?noredirect=on&utm_term=.c4a64e291143&wpisrc=nl_heads-draw6&wpmm=1.

[5] CoreCivic Inc., Form 10-K Annual Report, U.S. Securities and Exchange Commission, at 62 (Feb. 22, 2018), http://ir.corecivic.com/static-files/6e38a54c-cdea-4ff9-ba06-f24d38a6ad60.

Under terms of the amended IGSA entered into in October 2016, the revenues generated at the South Texas Family Residential Center declined and operating margin percentages at the facility became more comparable to those of our average owned and managed facilities, resulting in a material reduction to our facility net operating income in 2017.

**B. Eloy Ignores CoreCivic's Long, Well-Documented History of Mistreating and Endangering Detainees, Including at the Eloy Adult Detention Facility and Dilley.**

45.     Journalists and government oversight bodies have uncovered rampant lapses and abuses, including inmate deaths, at numerous CoreCivic facilities.[6]  Eloy was or should have been aware of these deficiencies, which have been widely reported and documented for years.

46.     The DHS Office of the Inspector General found in 2017 that conditions at immigration detention facilities, including centers operated by CoreCivic, "undermine[d] the protection of detainees' rights, their humane treatment, and the provision of a safe and healthy environment."[7]  In particular, the Inspector General noted reports at some facilities, including a detention center run by CoreCivic, that "medical care may have been delayed and was not properly documented."

47.     Even before the Inspector General's report, Eloy should have been well aware of deficient medical care at CoreCivic facilities.  Substandard medical care by CoreCivic had been contributing to inmate deaths at the Eloy facility for nearly a decade before the City added the Dilley facility to its portfolio with CoreCivic.

---

[6] *See Audit of the United States Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Detention Center*, Leavenworth, Kansas, Office of the Inspector General, U.S. Department of Justice (April 2017), https://oig.justice.gov/reports/2017/a1722.pdf; Seth Freed Wessler, *The 25 Men Whose Lives Ended Under Questionable Circumstances*, Nation (Jan. 28, 2016), https://www.thenation.com/article/25-deaths-in-contract-facilities/.

[7] U.S. Department of Homeland Security Office of the Inspector General, *Concerns About ICE Detainee Treatment and Care at Detention Facilities* (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

48.     In 2005, an inmate at Eloy died of cardiac arrest after repeated unavailing attempts to seek medical attention from staff.[8]

49.     In 2007, an inmate at Eloy died of undiagnosed testicular cancer despite his repeated attempts to seek medical treatment.[9]

50.     In 2011, an inmate at Eloy died of congestive heart failure after staff failed to seek medical treatment for him despite repeated sick calls, including his report to staff that he was vomiting after every meal.[10]

51.     In 2012, a diabetic inmate at the Eloy adult detention facility died after staff ignored urgent calls for help.  After the inmate began to have trouble breathing, and despite his cellmate's pleas for medical assistance, staff at the facility waited eight hours before taking him to the emergency room.  Medical experts who reviewed the case agreed that his death was "very likely preventable . . . [i]f diagnosed properly and treated."[11]

52.     And in 2015, an inmate at the Eloy facility committed suicide after medical staff failed to provide adequate mental health supervision.  He was at least the fifth inmate to commit suicide at Eloy.  Several of these deaths occurred after the staff at the facility reduced the inmate's suicide watch.

53.     Eloy knew or should have known of these deaths and the substandard detention conditions and medical care that produced them.  Eloy also was or should have been aware that these incidents reflected CoreCivic's default on its obligation to

---

[8] *See* Jeanne Kuang, *Immigration Detention Deaths Reach the Highest Total Since 2009*, Houston Chron. (Jan. 16, 2018, 12:22 pm CT), https://www.houstonchronicle.com/news/houston-texas/houston/article/Immigration-detention-deaths-reach-the-highest-12494624.php.

[9] *Id.*

[10] *Id.*

[11] *Systemic Indifference: Dangerous & Substandard Medical Care in U.S. Immigration Detention*, Human Rts. Watch (May 8, 2017), https://www.hrw.org/report/2017/05/08/systemic-indifference/dangerous-substandard-medical-care-us-immigration-detention

12

provide humane, safe detention conditions.  Indeed, after years of mounting reports of abuses at privately-run detention facilities, in 2016 the Department of Justice ordered the Bureau of Prisons to end or reduce its reliance on contracts with private prison operators such as CoreCivic, noting that private detention facilities "compare poorly to our own Bureau facilities," as they "do not provide the same level of correctional services, programs, and resources," and "do not maintain the same level of safety and security."[12]

54.     Nevertheless, Eloy continued to contract with CoreCivic, not just to operate the Eloy adult detention center with its documented and sordid record of detainee mistreatment, but also to run a massive immigration detention facility for families and children 900 miles away.

55.     Eloy knew or should have known that, under the conditions of its contract with ICE, it was legally responsible, and could be held liable, for failing to ensure adequate care to the children confined at Dilley.  But Eloy failed to take measures to assess whether CoreCivic was providing adequate conditions at Dilley, much less correct any inadequacies.  Rather, Eloy ignored the dangerous, inhumane, and substandard conditions at Dilley.

56.     As a result of Eloy's negligence and recklessness, immigrants detained at Dilley have received woefully inadequate medical care over the four years that Dilley has been in operation.

---

[12] Letter from Deputy Attorney General Sally Yates to Acting Director of Federal Bureau of Prisons (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download. President Trump later rescinded this directive after taking office. Christopher Dean Hopkins, *Private Prisons Back in Mix for Federal Inmates as Sessions Rescinds Order*, NPR (Feb. 23, 2017), https://www.npr.org/sections/thetwo-way/2017/02/23/516916688/private-prisons-back-in-mix-for-federal-inmates-as-sessions-rescinds-order. Notably, CoreCivic contributed $250,000 to the President's inauguration committee.  Nicholas Confessore et al., *Trump Inaugural Drew Big Dollars From Donors With Vested Interests*,

57.     Both internal ICE reports and reports by outside groups have repeatedly identified significant failings in medical care at the facility.  Yet none of these reports prompted Eloy to investigate or remedy these deficiencies.

58.     In 2015, a group of direct services legal providers in regular personal contact with hundreds of immigrants detained at Dilley lodged  formal complaints about the inadequate medical care at the facility.[13]

59.     The organizations detailed many cases where deficient medical care endangered children or worsened their illnesses.  These cases are entirely consistent with the pattern of inadequate medical care reported in CoreCivic immigration facilities across the country:  CoreCivic staff repeatedly withhold adequate care until a medical situation becomes critical and requires a major intervention.  Among the examples were the following:

- A child's weight loss during two months in detention worried her mother, who sought medical care for her at the Dilley clinic three times.  However, "it was not until the child collapsed and the clinic held her overnight that her illness was properly treated."

- A seven-year-old boy repeatedly sought medical care at the clinic and was turned away.  When the child finally took a urine test, he was rushed to a hospital in San Antonio and diagnosed with juvenile diabetes.  Even after this incident, the clinic turned him away when he went for his scheduled follow-up appointment.

- When a mother took her two-year-old daughter to the clinic with a respiratory virus, the nurse told her that "all of the children here" have that illness.  The girl later developed asthma in the facility, but the mother had to seek medical care on seven occasions before her daughter received

---

[13] *See* Letter to Megan Mack, DHS Office of Civil Rights and Civil Liberties (CRCL), and John Roth, DHS Office of the Inspector General (OIG), Regarding ICE's Failure to Provide Adequate Medical Care to Mothers and Children in Family Detention Facilities (July 30, 2015), https://www.aila.org/advo-media/press-releases/2015/deplorable-medical-treatment-at-fam-detention-ctrs/public-version-of-complaint-to-crcl; Letter to CRCL and OIG Regarding ICE's Continued Failure to Provide Adequate Medical Care to Mothers and Children Detained at the South Texas Family Residential Center (Oct. 6, 2015), https://www.aila.org/advo-media/press-releases/2015/crcl-complaint-family-detention/cara-jointly-filed-a-complaint.

medical treatment.  The girl now must take daily prescription medication and use an inhaler four to eight times a day to treat the asthma she developed while at CoreCivic's facility.

60.    The organizations also detailed examples of inappropriate or callous treatment of child detainees by its medical staff:

- A two-year-old boy received five vaccinations in his leg in a single appointment despite his mother's protests that he was up to date on all of his vaccinations. After the vaccinations, the boy could not walk, spiked a high fever, and could hardly eat.

- A mother who sought psychological treatment while at Dilley was forced to conduct all her appointments with her ten-year-old daughter in the room, even though the daughter cried every time the mother started to tell her story.  The family fled Honduras because a gang there had beaten the daughter.  The mother's psychologist told her the daughter had to stay in the room for the appointments, and "gave [the daughter] some gum to calm her down."  After the mother later attempted suicide, the Dilley staff held both mother and daughter in isolation for three days.

- A twelve-year-old girl had to flee El Salvador without her glasses.  On arrival at Dilley, her mother immediately notified staff that her daughter would need a new pair, and the girl underwent eye testing on August 15, after which doctors assured her mother that she would receive the glasses. Six weeks later, her daughter had still not received them.  Because of her impaired vision, she suffered from headaches and had trouble at school.

- A two-year-old boy had diarrhea for 15 straight days; his mother sought medical attention at the Dilley clinic seven days in a row.  On six of those seven days , she was turned away after a six-plus hour wait.  On the one day she managed to see a nurse, the "medical advice" was "to have her son drink water."

61.    One detained mother who was herself an experienced nurse "felt there was no point in returning to the [Dilley] clinic" after the attending nurse at the clinic told the mother that "no doctor was on site [and] she was not authorized to prescribe medication," and told the mother to treat her four-year-old's cough and dramatic weight loss with "water and Pedialyte."

15

62.   These stories were not anomalies; they demonstrated systemic failures to provide adequate and humane medical care at Dilley.  The direct service providers that filed the DHS complaint found that mothers and children often enter Dilley with injuries or illnesses that go untreated for the duration of their confinement.  Others contract illnesses while in detention, for which they likewise receive inadequate medical care.  The complaint stated that "women and children reported wait times of three to fourteen hours to receive medical care," including for serious and urgent conditions.

63.   In addition, the organizations reported that "medical professionals provide insufficient information about medical care to mothers and disregard their concerns, the information they provide, and their complaints," and routinely fail to provide appropriate follow-up treatment.

64.   The organizations also noted disturbing deficiencies even when patients did receive medical treatment at Dilley and other facilities, including attendants' prescribing nothing but water and Vicks VapoRub to treat children who had fevers and infections or viruses.

65.   A series of declarations taken by the CARA Pro Bono Project from Dilley detainees in 2017 reported the same derelictions.  Dilley medical staff still routinely failed to respond to repeated, desperate requests from mothers whose children were becoming increasingly ill.

66.   An eighteen-year-old woman who had fled El Salvador with her two-year-old daughter told CARA that after a week at Dilley, her daughter became sick "with a fever, congestion, and a cough," and was not breathing well.  She took her daughter to Dilley's central clinic.  The staff "told me [my daughter] was fine and did not give her any medicine."  A day later, the clinic gave her ibuprofen for her daughter.

67.   The next day, a doctor told her he would give her five days of antibiotics to treat her child's illness.  However, when the mother visited the

16

pharmacy, the pharmacist only gave her one, and refused to provide additional days' worth of treatment despite her repeated visits to ask for more medication.

68.     Two days later, her daughter's situation had deteriorated:

On the night of Tuesday, October 24, [my daughter] was very sick. My roommates and I were very worried because she was just lying in bed and not even looking around.  Sometimes she would sit up and try to breathe with great difficulty.  [My roommate and I took her to the clinic at 9pm, but] [t]he medical staff said that there were not doctors available at night, and gave me an appointment for the next day.

The next day a CoreCivic staff [member] came to my room and said that [my daughter] had a doctor's appointment.  When we arrived at the clinic, she was in a very bad state.  She was not breathing well, could not hold her eyes open or lift her head, and did not move or react when people talked to her.  The medical staff listened to her lungs and measured her oxygen level . . . [and] told me that they did not have a sufficient oxygen supply to treat her, so they called the hospital in San Antonio.  We waited 40 minutes for a helicopter to arrive[.]

When I arrived at the hospital, the doctors had given [my daughter] an IV. . . . They gave her a lot of antibiotics and iron.  They said she had a bacterial infection in her lungs.  After three days of the medicine she was back to eating and playing normally[.] . . .

I believe that if [my daughter] had been able to take her whole course of antibiotics earlier she would not have had to be taken to the hospital, and especially not by helicopter.

69.     Again, this mother's complaint reflected the pervasive problems at Dilley.  Not only were children at the facility not receiving adequate medical care, but the detention center had clearly become a breeding ground for severe pediatric illness.

70.     A volunteer who worked at Dilley in late 2017 reported that the medical center was filled with young children who were coughing, sneezing, and lethargic. Many children had high fevers, conjunctivitis, serious diarrhea and nausea.  Other children had rashes as a result of drinking contaminated tap water.  This volunteer noted that, as before, the children's "obvious medical problems" did not appear to be receiving adequate medical attention.  Among other things, mothers reported that

clinic staff failed to conduct physical examinations, failed to communicate about symptoms and diagnoses, made illogical and incorrect diagnoses of patients, and prescribed water instead of medicine.

71.    Other mothers who spoke to CARA in 2017 reported numerous delays, mistakes, and questionable treatment decisions by Dilley medical staff.  One mother told CARA that medical staff gave her four-year-old daughter six vaccinations in one appointment just days after her daughter had gotten over a bout of fever, vomiting, and diarrhea.  Within hours of receiving the vaccinations, the girl was feverish and vomiting again; a doctor at the clinic subsequently told the mother that her daughter was presenting symptoms of bulimia.

72.    A male guard berated another mother for trying to pick up acetaminophen from the pharmacy for her four-year-old son, who had a fever, after her 8:00 pm curfew.

73.    A third mother said medical staff at the clinic told her that her two-year-old son's 104º fever and shortness of breath were "normal symptoms that children have when they arrive in a new country."

74.    In addition to more than a dozen declarations from mothers about inadequate care provided to their children at Dilley, members of the CARA Pro Bono Project have sent dozens of emails to ICE regarding inadequate medical care for both children and adults jailed at Dilley, including at least 41 emails over a one-year period.

75.    Medical treatment and conditions at Dilley and the country's smaller family detention facilities have been so bad that the major organizations of physicians have challenged them publicly.  The American Academy of Pediatrics wrote to the Secretary of DHS in 2015 "to express [its] concerns for the health and well-being of children and mothers who are being detained in family detention centers in Texas and Pennsylvania."  The organization "question[ed] whether the existing family detention

facilities are capable of providing generally recognized standards of medical and mental health care for children."[14]

76.     Just last year, the American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, and the American Academy of Family Physicians wrote to ICE to protest a policy change allowing ICE to place pregnant women in family detention at Dilley and other facilities despite the lack of adequate medical care at those facilities.  The organizations stated:  "It has been documented that while in immigration detention facilities, pregnant women and adolescents experience poor access to medical care. . . . . Pregnant women and adolescents should have access to high levels of care, care that is not available at these facilities.  The conditions in DHS facilities are not appropriate for pregnant women or children."[15]

77.     Most recently, two physicians who have served as "subject-matter experts" for DHS's Office of Civil Rights and Civil Liberties wrote to the Senate's Whistleblower Protection Caucus to alert them to grave health and safety hazards to children at Dilley and other family detention facilities.  The doctors based their letter on ten studies of family detention facilities that they conducted over four years.  Among the problems they reported at Dilley:

- "Dilley, a facility that was supposed to be designed for family detention, lacked sufficient medical space resulting in the use of a gymnasium for medical overflow."

- "Dilley has had difficulty sufficiently staffing enough pediatricians. Dilley was never able to hire a child and adolescent psychiatrist."

---

[14] Letter to DHS Secretary Jeh Johnson from the American Academy of Pediatrics (July 24, 2015), available at https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAP%20Letter%20to%20Secretary%20Johnson%20Family%20Detention%20Final.pdf.

[15] Letter to Thomas Homan, Acting Director of ICE, from medical professionals (Mar. 30, 2018), available at https://www.aila.org/infonet/medic-professionals-against-ice-deten-policies (emphasis added).

- "HQ and facility staff at Dilley failed to develop an adequate plan for typical parenting challenges like two-year-old's biting or hitting peers and instead placed toddlers (with parent) in medical isolation for days.  This practice is abusive[.]"

- "[A]t Dilley, an IHSC nurse (Health Services Administrator) deployed a vaccination program without the approval of and during the absence of the Clinical Medical Authority and medical director, a pediatrician.  The program resulted in the vaccination of numerous children with the incorrect dose of vaccine (adult doses were given) because none of the providers were familiar with the labels and markings of pediatric vaccines."[16]

78.     The doctors told the Whistleblower Protection Caucus that they had already filed a complaint with the DHS Inspector General and communicated with the director of the Office of Civil Rights and Civil Liberties, "but because we are concerned that the practice of incarceration continues. . . we are reaching out to you. . . . [W]e have an ongoing duty to do whatever is necessary to prevent further harm to children and their families."[17]

79.     Eloy knew or should have known about many of the problems at Dilley because the national media reported on them extensively.[18]

---

[16] Letter from Dr. Scott Allen and Dr. Pamela McPherson to Senators Charles E. Grassley and Ron Wyden, July 17, 2018, available at https://www.wyden.senate.gov/imo/media/doc/Doctors%20Congressional%20Disclos ure%20SWC.pdf.

[17] *Id*. at 3.

[18] *See, e.g.*, Anne Gordon, US and Its Moral Obligation to Those at the Border, Hill (Nov. 20, 2018, 9:00 AM ET), https://thehill.com/opinion/immigration/417504-us-and-its-moral-obligation-to-those-at-the-border; Philip Jordan, The Awful Things I Saw and Heard at the Border, Daily Beast (Oct. 12, 2018), https://www.thedailybeast.com/the-awful-things-i-saw-and-heard-at-the-border; Courtney Grogan, Catholics Minister to Mothers and Children in Texas Detention Centers, Catholic News Agency (Aug. 23, 2018, 2:13 PM), https://www.catholicnewsagency.com/news/faith-and-family-in-texas-detention-centers-84951; Amber Jamieson, Advocates Say Immigrant Children Separated From Their Parents Spoke of Being Kicked by Guards, Buzzfeed News (July 28, 2018, 5:12 PM ET), https://www.buzzfeednews.com/article/amberjamieson/separated-children-abuse-kicked?bfsplash&utm_term=4ldqpho#4ldqpho; Carolina Moreno & Anna Almendrala, Guards at a Family Detention Center Refused to Take Her Son to the Doctor. Then He Started Convulsing. Huffington Post (July 26, 2018, 2:25 PM ET),

80.    On multiple grounds, from multiple sources, Eloy knew or should have known of the hazardous and inhuman conditions at Dilley.  But Eloy did nothing to intervene or exercise the slightest level of supervision.

## C. Eloy's Willful Blindness Leads to the Preventable Death of Yasmin Juaréz's One-Year-Old Daughter, M.J.

81.    With dozens of mothers reporting that grossly inadequate medical care at Dilley had endangered their children, it was only a matter of time until Eloy's recklessness and negligence led to the death of a child.

82.    On or around March 1, 2018, Ms. Juárez, a citizen of Guatemala, and her then-19-month-old daughter M.J. crossed the Rio Grande into southern Texas. Ms. Juárez feared for her and M.J.'s life and safety in Guatemala, and they had fled to seek asylum in the United States.

83.    On their apprehension near the border, mother and daughter were temporarily detained at a U.S. Customs and Border Patrol immigration processing center, then transferred together to Dilley four days later.

84.    M.J. was a normal, healthy, happy child when she arrived in the United States.  She had never suffered from any significant medical problems or chronic medical conditions.  The medical personnel who processed M.J. for intake at Dilley on March 5, 2018, also noted no current illnesses or health problems before clearing her for custody.

85.    At Dilley, the officers assigned Ms. Juárez and M.J. to a single room with five other mothers, each with a child.  Several children were ill.

86.    One boy, around M.J.'s age, had a constant cough and runny nose, and was very lethargic.  Ms. Juárez learned from the boy's mother that he had fallen ill at

---

https://www.huffingtonpost.com/entry/us-immigration-family-detention-health-perils_us_5b58b3a0e4b0de86f492ba56;   Bree Bernwanger & Gracie Willis, Family Detention Is Not the Answer to Family Separation. It's a Failure and a Disgrace., USA Today (July 23, 2018, 10:13 AM ET), https://www.usatoday.com/story/opinion/2018/07/23/family-detention-centers-no-remedy-separated-families-column/796328002/

Dilley.  His mother had sought medical attention for her son, taking him to the clinic very early in the morning, but the two were sent back to the housing area without being seen.

87.    Within a week, M.J. developed similar upper respiratory symptoms, including congestion and a productive cough.

88.    On March 11, 2018, a physician assistant performed a physical exam of M.J., noting "no [history] of acute or chronic medical illnesses" and describing M.J.'s general appearance as "well developed" and "well nourished."  But M.J. also had a cough, congestion, runny nose, and "red and swollen turbinates" (soft tissue on the side walls of the nasal cavity).  The physician assistant diagnosed M.J. with an acute upper respiratory infection and prescribed Tylenol for comfort.  The medical record also indicates that the physician assistant prescribed honey packs for cough and directed a follow-up in "6 months."

89.    The next day, March 12, 2018, Ms. Juárez again sought medical attention for M.J., who was then refusing food, running a fever of 104.2º and suffering from cough, congestion, diarrhea, and vomiting.    Another physician assistant diagnosed an ear infection—for which he prescribed Augmentin, an antibiotic—as well as acute bronchiolitis—for which he prescribed fever reducers and oral hydration.  Ms. Juárez was concerned about M.J.'s respiratory symptoms and asked the physician assistant to conduct more examinations.  But the physician assistant merely instructed Ms. Juárez to return to the clinic if M.J.'s symptoms worsened, scheduled a follow-up in two days, and sent mother and daughter back to the housing area.

90.    In the subsequent days, M.J.'s fever decreased somewhat, but she could not hold down the Augmentin prescribed for her ear infection.  Her breathing problems significantly worsened, and she continued to have diarrhea.  Ms. Juárez sought medical attention for M.J. multiple times but was often left waiting for many hours, including at least two instances where she was turned away and told to wait for

an appointment on a later day.  The clinic waiting area, resembling a gymnasium, was filled with dozens of mothers and children standing in line to be seen.  There was no separate area to isolate sick children from healthy ones, nor did the staff provide protective masks to guard against contagion.  And when Ms. Juárez and M.J. did get in to see medical staff, the medical appointments often lasted just minutes, and Ms. Juárez believed that medical staff did not address her concerns about M.J.'s deteriorating condition.  Ms. Juarez's experience echoes the accounts of parents who for many years have complained about extended waits and cursory examinations from medical staff. See supra ¶¶ 35-37, 40-43.

91.     By March 15, 2018, when M.J. was next able to see a third physician assistant, the little girl had lost two full pounds—nearly 8% of her body weight—in just 10 days since arriving at Dilley.  She continued to suffer from fever, congestion, cough, upset stomach, and very poor appetite.  The physician assistant noted an "upper respiratory infection" and directed Ms. Juárez to continue with Tylenol and Pedialyte, and to follow up in one week.

92.     M.J.'s fever worsened.  On March 21, 2018, she presented with a 103.3° temperature, an elevated respiratory rate, and a rapid heart rate, as well as a cough, congestion, sneezing, and runny nose.  The physician stated that M.J. had "no tachypnea," despite the respiratory rate on the same form showing otherwise, and diagnosed acute viral bronchiolitis.  The physician prescribed Pedialyte, Ibuprofen for fever, Zyrtec for runny nose, and Vicks VapoRub for congestion.

93.     As any pediatrician should know—and as the product's label and website clearly warn—that Vicks VapoRub should not be used with children under two years old because it contains camphor, which can cause respiratory distress, particularly if the child's airways are already inflamed.

94.     However, the doctor's prescriptions for M.J. followed a well-known repertoire at Dilley.   Time and again, physicians and nurses at the clinic have

prescribed electrolytes, aspirin, water, and VapoRub for a variety of cases where they are inadequate, inapposite, or even contraindicated.  See supra ¶¶ 35-37.

95.    After ordering the use of a medicine contraindicated for such a young patient, the physician directed Ms. Juárez again to follow up in one week, or to return if M.J. demonstrated signs of respiratory worsening.

96.    Two days later, on March 23, 2018, Ms. Juárez once again brought M.J. to the clinic, reporting that M.J. had been coughing and vomiting clear liquid.  The child was also suffering congestion, nasal discharge, a borderline oxygen saturation of 96%, an elevated heart rate, and a temperature of 99.2º.  Her examination revealed "red sclera," which indicates an adenovirus, though the registered nurse made no note of that possible cause.  Again, the nurse's failure to properly diagnose M.J.'s illness followed a pattern all too common at Dilley.  *See supra* ¶¶39, 43.

97.    By this time, M.J. had been ill with a cough for nearly two weeks and had barely regained any weight.  Ms. Juárez asked the registered nurse to conduct a more detailed examination, particularly of M.J.'s lungs.  After listening to M.J.'s lungs, the registered nurse returned mother and daughter to the housing area, noting that "a referral would be made for [M.J.] to see a provider."  But M.J. left Dilley two days later never having seen another medical provider.

98.    Over those two days, M.J.'s condition deteriorated rapidly.  She had constant diarrhea and a fever, vomited frequently, and had difficulty sleeping or eating.  On March 24, 2018, Ms. Juárez was notified of an appointment for M.J. to be seen at 8 o'clock the next morning.  But that appointment never happened.  Instead, at 5:00 a.m. on March 25, 2018, Dilley staff took Ms. Juárez and M.J. to a staging area to be processed for transfer out of family detention and a flight to New Jersey.  Ms. Juárez and M.J. (who was still vomiting) waited there until noon, when they were taken to another location at Dilley, fed lunch, and put in a van to San Antonio International Airport.  No medical personnel examined M.J. to clear her for travel.

99.     Ms. Juárez and M.J. boarded a late afternoon flight with a connection to New Jersey.  M.J. slept for most of the flights but vomited in the last hour.  A fellow passenger commented to Ms. Juárez that M.J. looked very unwell and needed to see a doctor.

100.    Although no medical personnel saw M.J. on the day of their departure from Dilley, ICE medical records state that, on March 25, 2018, a "licensed vocational nurse" conducted a "Transfer Summary" before mother and daughter were released.  The record states that the licensed vocational nurse "medically cleared" M.J. for release from Dilley.

101.    This record was falsified, because no licensed vocational nurse (nor anyone else) actually examined M.J. that day.

102.    But even if the nurse had examined M.J., a licensed vocational nurse was not qualified to make such a determination, and doing so exceeded the scope of her license.   Under Texas law, licensed vocational nurses are not authorized to perform comprehensive patient assessments, to initiate any nursing care plan, or to implement or evaluate patient care.

103.    The record from M.J.'s March 23 appointment—just two days earlier— indicated that M.J. was acutely ill and that she would be referred to a physician.  But under the heading "History of Present Illness," the licensed vocational nurse's March 25 "Transfer Summary" contains no information about M.J.'s condition at that time, no indication that she was coughing and wheezing, that she had lost a substantial percentage of her body weight, or that she had suffered intermittent high fevers over a prolonged period of time.  Instead, without even seeing M.J., the licensed vocational nurse noted these questions and answers:

> Is there any medical / dental / or mental health reasons for restricting the
> length of time the alien can be on travel status?   *No*
> Are there any restriction [sic] or special equipment required for travel?   *No*
> Is a medical escort required? *No*
> Are any transmission-based precautions required during transport?  *No*

Additional comments? *None*

104.    By the time mother and daughter arrived in New Jersey after midnight, early in the morning of March 26, 2018, M.J.'s condition was dire.  Hours later, after sunrise on March 26, Ms. Juárez took M.J. to a pediatrician.  After several hours, the pediatrician sent Ms. Juárez and M.J. home with additional medications and instructions to seek emergency medical attention if M.J.'s condition deteriorated further.

105.    But by then it was too late.  Hours later, on the evening of March 26, M.J. was admitted to the emergency room, where she presented in acute respiratory distress with a critically low blood oxygen level of 85%, requiring continuous supplemental oxygen.  Shortly after admission, M.J. was moved to the Special Care Unit with a diagnosis of viral bronchiolitis versus pneumonia.  She tested positive for adenovirus and parainfluenza 3.  Over the next six weeks, M.J. was transferred to two different hospitals for increasingly specialized care due to her progressive respiratory failure, requiring painful treatments including a ventilator and later an advanced life support device (ECMO) used in dire situations.

106.    M.J.'s condition steadily worsened, and she died on May 10, 2018, following a catastrophic intrathoracic hemorrhage that resulted in irreversible brain and organ damage with no hope of survival.  The cause of death was identified as bronchiectasis, pulmonitis, and pneumothorax (collapsed lung).

107.    In the final six weeks of M.J.'s life, Ms. Juárez watched as her daughter suffered extreme physical and emotional pain.  M.J. was hospitalized continuously, surrounded by multiple medical personnel performing painful tests and examinations. She was often chemically paralyzed and sedated.  She had multiple intravenous (IV) lines that needed to be replaced frequently, an arterial IV line for monitoring her blood gases, a naso-gastric for tube feedings, intravenous nutritional supplementation,

and a urinary catheter.  While ventilated, she could not speak.  While sedated and on paralytic drugs, along with all the IV lines, she could not hug her mother or be held.

108.   Despite all the medical measures, M.J. continued to deteriorate and lung transplant evaluation was considered.  In the last few hours of her life, following the catastrophic hemorrhage, M.J. experienced a chest tube insertion, replacement of the advanced life support device, massive blood transfusions, and CPR on her tiny body.

109.   On the day her daughter died, Ms. Juárez left the hospital with only an ink print of M.J.'s right hand, made the day before as a Mother's Day gift.

110.   M.J.'s death at age twenty-one months shortly after being released from Dilley was a direct consequence of the City of Eloy's failure to ensure that its contractor complied with Eloy's IGSA with ICE, despite Eloy's legal responsibility under the IGSA.

111.   After years of near misses and glaring warning signs, Eloy's failure to exercise even minimal supervision over its contractor in exchange for a nearly half-million dollar a year windfall led to the death of a little girl.

112.   The City of Eloy is legally responsible for the harm that resulted from its failure to observe the legal obligations created by its Dilley IGSA with ICE.

113.   On September 24, 2018, 27 days after Ms. Juárez filed her notice of claim against Eloy, at the request of ICE and CoreCivic, the Eloy City Council approved an amendment to the IGSA to terminate the contract requirements relating to Dilley, effective September 18, 2018.

**COUNT I**
**WRONGFUL DEATH BY WRONGFUL ACT, NEGLIGENCE, GROSS**
**NEGLIGENCE, RECKLESSNESS**
**(Ariz. Rev. Stat. §§ 14-3110, 12-611 et seq.)**

114.   The allegations in all prior paragraphs are incorporated herein.

115.   As the government contractor with direct supervisory authority over the Dilley facility, CoreCivic Inc., and CoreCivic's employees and contractors, the City of Eloy had a duty to maintain safe and sanitary conditions at Dilley, including a duty

to ensure safe and sanitary conditions appropriate for small children detained at the facility.

116.   In its role as government contractor, the City of Eloy also had a duty to ensure that those detained at Dilley, including small children, received adequate medical care that adhered to standards of pediatric medical care.

117.   The City of Eloy breached these duties by (1) failing to ensure safe, sanitary, humane conditions at Dilley, including safe and sanitary conditions appropriate for small children; (2) failing to ensure adequate medical staffing; and (3) failing to address repeated reports of inadequate medical care at Dilley.

118.   As a direct and proximate result of Eloy's negligent, grossly negligent, and reckless acts, omissions, and conduct, M.J. contracted a likely common and treatable upper respiratory illness and suffered avoidable complications of this respiratory illness that were allowed to progress until they were irreversible and ultimately fatal.  Eloy's negligence, gross negligence, and recklessness also caused M.J. to suffer extreme and extended physical, mental, and emotional pain and distress, loss of earnings, and death.

119.   As a direct and proximate result of Eloy's negligent, grossly negligent, and reckless acts, omissions, and conduct that caused her daughter's death, Yazmin Juárez suffered extreme mental and emotional pain and distress, as well as loss of love and companionship, medical expenses, and other harms.

**COUNT II**
**NEGLIGENT TRAINING AND SUPERVISION**

120.   The allegations in all prior paragraphs are incorporated herein.

121.   As the government contractor with direct supervisory authority over the Dilley facility, CoreCivic Inc., and CoreCivic's employees and contractors, the City of Eloy had a duty to prevent its employees or independent contractors from causing physical harm to a third party.

122.    Eloy breached its duty by failing to ensure safe, sanitary, humane conditions at Dilley, including by failing to carry out adequate management oversight of the provision of medical care at the detention facility.

123.    As a direct and proximate result of Eloy's acts, omissions, and conduct, M.J. contracted a likely common and treatable upper respiratory illness and suffered avoidable complications of this respiratory illness that were allowed to progress until they were irreversible and ultimately fatal.  Eloy's negligence and gross negligence caused M.J. to suffer extreme and extended physical, mental, and emotional pain and distress, loss of earnings, and death.

124.    As a direct and proximate result of Eloy's negligent acts, omissions, and conduct that caused her daughter's death, Yazmin Juárez suffered extreme mental and emotional pain and distress, as well as loss of love and companionship, medical expenses, and other harms.

**JURY TRIAL REQUESTED**

125.    Plaintiff requests that this case be tried by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

A.    Damages, including compensatory damages, in an amount to be proven at trial;

B.    Costs, as well as pre- and post-judgment interest pursuant to A.R.S. §§ 12-341, 12-823 and any other applicable statute and/or rule.

C.    Such other and further relief as the Court deems just.

1              RESPECTFULLY SUBMITTED this 28th day of February, 2019.

2                           OSBORN MALEDON, P.A.

3

4                       By  s/David B. Rosenbaum
                           David B. Rosenbaum

5                           Hayleigh S. Crawford
                           2929 North Central Avenue, 21st Floor

6                           Phoenix, Arizona 85012-2793

7                           R. Stanton Jones
                           Robert N. Weiner*

8 * *Pro hac vice application to be*    Sally L. Pei
   *filed*                         Daniel F. Jacobson*

9 †*Admitted only in New York,*    Emily Chertoff*†
  *practicing law in the District of*  ARNOLD & PORTER

10 *Columbia under the supervision of*    KAYE SCHOLER LLP
   *Firm principals who are D.C. Bar*  601 Massachusetts Ave. NW

11 *members.*                   Washington, DC 20001

12                           *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28