**EXHIBIT 1**

**EXHIBIT 1**

CITY OF ELOY, ARIZONA                                      DROIGSA-06-0002

## INTER-GOVERNMENTAL SERVICE AGREMENT

### CITY OF ELOY, ARIZONA

This Inter-Governmental Service Agreement (IGSA) is for Detention Services to be provided to United States Immigration and Customs Enforcement, hereinafter referred to as "ICE", for the detention and care of aliens (thereafter referred to as "DETAINEES").

**FACILITY LOCATION:**

The **PROVIDER** shall provide detention services for detainees at the following institution:

**Eloy Detention Center**
**1705 East Hanna Road**
**Eloy, Arizona 85231**

**PERFORMANCE:**

The **PROVIDER** is required to house ICE detainees, to perform in accordance with the most current editions of **ICE Detention Requirements, American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF)**, and **Standards Supplement, Standards for Health Services in Jails, latest edition, National Commission on Correctional Health Care (NCCHC)**. Some ACA standards are augmented by ICE policy and/or procedure. In cases where other standards conflict with DHS/ICE Policy or Standards, DHS/ICE Policy and Standards prevail. ICE Inspectors will conduct periodic inspections of the facility to assure compliance of the aforementioned standards.

The **PROVIDER** shall maintain continual compliance with ACA accreditation standards during performance of this agreement.

The **PROVIDER** shall be responsible for all costs associated with obtaining and maintaining full accreditation by ACA.

**PERIOD OF PERFORMANCE:**

This Agreement shall become effective upon the date of final signature by ICE and the **PROVIDER** and shall remain in effect indefinitely unless terminated in writing, by either party. Either party must provide written intentions to terminate the agreement, 120 days in advance of the effective date of formal termination.

**PAYMENT RATE**

**Per Diem Rate:**

---

Page 1 of 6 Pages

02/13/2006   20:43    5204663161

CITY OF ELOY, ARIZONA                           DROIGSA-06-0002

In consideration for the **PROVIDER'S** performance under the Terms and Conditions of this Agreement, ICE shall make payment to the **PROVIDER** for each detainee accepted and housed by the **PROVIDER**. The rate is the per diem rate for the support of one Detainee per day and shall include the day of arrival but not the day of departure.

The **PROVIDER** shall not charge for costs, which are not directly related to the housing and detention of detainees. Such costs include, but are not limited to:

A)   Salaries of elected officials.

B)   Salaries of employees not directly engaged in the housing and detention of detainees.

C)   Indirect costs in which a percentage of all local government costs are pro-rated and applied to individual departments.

D)   Detainee services which are not provided to, or cannot be used by detainees.

E)   Operating costs of facilities not utilized by **detainees**.

F)   Interest on borrowing (however represented), bond discounts, cost(s) of financing/refinancing, and legal or professional fees.

This agreement in no way obligates Immigration and Customs Enforcement to any minimum population guarantee.

MODIFICATION:

This Agreement, or any of its specific provisions, may be revised or modified by signatory concurrence of the undersigned parties, or their respective official successors.

TRANSPORTATION SERVICES:

1.   The **PROVIDER** shall provide all ground transportation services as may be required to transport detainees securely, in a timely manner, to off-site medical providers. Transportation mileage reimbursable rates will be commensurate with current applicable federal travel allowance rates. When officers are not providing transportation services the **PROVIDER** shall assign the employees to supplement security duties within the facility or on-call duties to assist ICE as directed by the COTR or designated ICE official. However, the primary function of these officers is transportation. On-call duties as directed by the COTR utilizing these officers shall not incur any additional expense to the government.

2.   The PROVIDER personnel provided for the above services shall be of the same qualifications, receive the same training, complete the same security clearances, and wear the same uniforms as those PROVIDER personnel are provided for in

02/13/2006   20:43   5204663161                                               PAGE   04/07

CITY OF ELOY, ARIZONA                                    DROIGSA-06-0002

_____

the other areas of this agreement.

3.   During all transportation activities, at least one officer shall be the same sex as the
     detainee(s).   Questions concerning guard assignments shall be directed to the
     COTR for final determination.

4.   The **PROVIDER** shall, upon order of the COTR, or upon his own decision in an urgent
     medical situation, transport a detainee to a hospital location. An officer, or officers, shall
     keep the detainee under constant supervision 24 hours per day until the detainee is ordered
     released from the hospital, or at the order of the COTR.   The **PROVIDER** shall then
     transport the detainee to the detention site.

5.   When the COTR provides documents to the **PROVIDER** concerning the detainee(s) to be
     transported and/or escorted, the **PROVIDER** shall deliver these documents only to the
     named authorized recipients.  The **PROVIDER** shall ensure the material is kept
     confidential and not viewed by any person other than the authorized recipient.

6.   The **PROVIDER** shall establish a communications system that has direct and immediate
     contact with all transportation vehicles and post assignments. Upon demand, the COTR
     shall be provided with current status of all vehicles and post assignment employees.

**GUARD SERVICES:**

The **PROVIDER** agrees to provide stationary guard services as requested or required for detainees who
are committed to, or require, medical services beyond the secure perimeter of the facility. Qualified law
enforcement or correctional officer personnel employed by the **PROVIDER** under their policies,
procedure and practices will perform such services.  The **PROVIDER** agrees to augment such practices as
may be requested by ICE to enhance specific requirements for security, detainee monitoring, visitation, and
contraband control. Reimbursement for these stationary guard services is not separately priced and is
included in the per diem rate.

**MEDICAL SERVICES:**

In the event of an emergency, the **PROVIDER** shall proceed immediately with necessary medical
treatment. In such event, the **PROVIDER** shall notify ICE immediately regarding the nature of the
transferred detainee's illness or injury and type of treatment provided.

The **PROVIDER** agrees to accept and provide for the secure custody, care, and safekeeping of detainees
in accordance with the State, and local laws, standards, policies, procedures, or court orders applicable to
the operations of the facility.

The **PROVIDER** agrees to provide ICE detainees with the level of medical care and services as
appropriate as part of the per diem rate.  This rate includes but is not limited to:

_____

02/13/2006  20:43   5204663161                                    PAGE  05/07

CITY OF ELOY, ARIZONA                        DROIGSA-06-0002

- On-site sick call, medical appointments/services;

- Medication (over the counter/non-legend and routine drugs and medical supplies);

- Escort/security services for transport to/from emergency or non-emergency health care services as either an in-patient or outpatient.

When specifically requested by ICE, the **PROVIDER** agrees to arrange for and/or provide non-emergency ambulance transportation service to transport detainees from one off-site medical care facility to another. ICE agrees to provide reimbursement, over and above the per diem rate, to the **PROVIDER** for such ambulance transportation services when the costs are included with the regular monthly billing for detention services.

The **PROVIDER** agrees to cover all outside medical costs up to $██████ per event associated with hospital or health care services specifically provided to any detainee.

The **PROVIDER** shall also notify the designated contact person at the local ICE office, when any reimbursable medical care is provided to a detainee, in accordance with procedures to be established and mutually agreed upon. Notification must be made in advance of treatment other than in emergency situations.

RECEIPT AND DISCHARGE OF FEDERAL DETAINEES:

The **PROVIDER** agrees to receive and discharge Federal detainees only from and to properly identified law enforcement officers and with prior authorization. Admission and discharge of Federal detainees shall be fully consistent with **PROVIDER** policies and procedures.

ICE detainees shall not be released from the facility into the custody of other Federal, state, or local officials for any reason, except for medical or emergency situations, without express authorization of ICE.

INSPECTION:

The **PROVIDER** agrees to allow periodic inspections of the facility by ICE inspectors. Findings will be shared with facility administrators in order to promote improvements to facility operations or conditions of detainment.

PER DIEM RATE AND ECONOMIC PRICE ADJUSTMENT

The per diem rate shall be $████ and may not be adjusted prior to September 30, 2007. Thereafter, the per diem rate shall be subject to adjustment based on the actual and allowable costs associated with the operation of the facility. When a rate increase is desired, the Local Government shall submit a written request to Immigration and Customs Enforcement at least sixty (60) days prior to the desired effective date of the rate adjustment. All such requests must contain a detailed cost proposal to substantiate the desired rate increase. The Local Government agrees to provide additional cost information to support the requested rate increase and to permit an audit of accounting records upon request by Immigration and Customs

02/13/2006  20:43    5204563161                                                    PAGE  06/07

CITY OF ELOY, ARIZONA                                        DROIGSA-06-0002

Enforcement.  The rate may be renegotiated not more than once per year.

Criteria used to evaluate the increase or decrease in the per diem rate shall be those specified in the Office of Management and Budget (OMB) Circular A-87, Cost Principles for State, Local, and Indian Tribal Governments.

The effective date of the rate modification will be negotiated and specified in a modification to this IGSA, which is approved by the ICE Contracting Officer. The effective date will be established on the first day of the month for accounting purposes. Payments at the modified rate will be paid upon the return of the signed modification by the authorized Local Government official to ICE.

**BILLING PROCEDURE:**

    (A) Invoices - Invoices shall itemize each detainee by name, register number, dates of stay, and appropriate detainee-day rate.  Billing shall be based upon the actual number of detainee days used.

    (B)    Invoices Submission

        **U.S. Immigration and Customs Enforcement**
        Phoenix Field District Office
        2035 North Central Ave
        Phoenix, Arizona 85004
        (602) 379-3426

    (C)    Payment - Payments will be made to the **PROVIDER** after receipt of a complete invoice, which shall contain a remittance address.  All transfer(s) will be accomplished through Electronic Funds Transfer (EFT) on a monthly basis.  The Prompt Payment Act shall apply.

IN WITNESS WHEREOF, the undersigned, duly authorized officers, have subscribed their names on behalf of the City of Eloy, Arizona and U.S. Immigration and Customs Enforcement.

ACCEPTED:

U.S. Immigration and Customs Enforcement

By: _V. Who~_____

Date: _2/17/06_____

---

PAGE 07/07

02/13/2006  20:43    5204663161

CITY OF ELOY, ARIZONA

DROIGSA-06-0002

City of Eloy, Arizona

By: _____

Date: _____ 02/13/06 _____

**EXHIBIT 2**

**EXHIBIT 2**

AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | | PAGE OF PAGES |
|---|---|---|

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| P00004 | 02/01/2007 | FOW070007B | |

| 6. ISSUED BY | CODE | ICE |
|---|---|---|

U.S. Dept. Of Homeland Security
Immigration and Customs Enforcement
425 I Street, NW
Rm 2208
Washington DC 20536

| 7. ADMINISTERED BY (If other than Item 6) | CODE | ICE |
|---|---|---|

U.S. Dept. Of Homeland Security
Immigration and Customs Enforcement
425 I Street, NW
Rm 2208
Washington DC 20536

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

ELOY CITY OF
CITY OF ELOY
628 N MAIN ST
ELOY AZ 952310626

| | (x) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| | | |
| | | 9B. DATED (SEE ITEM 11) |
| X | | 10A. MODIFICATION OF CONTRACT/ORDER NO. |
| | | HSCEOP06FIG00002 |
| | | 10B. DATED (SEE ITEM 11) |

| CODE | 0025134220000 | FACILITY CODE | | 02/28/2006 |
|---|---|---|---|---|

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) | Net Increase: | $ |
|---|---|---|

See Schedule

13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THIS CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |
| X | Mutual Agreement |

| E. IMPORTANT: | Contractor | [ ] is not. | [X] is required to sign this document and return | 1 | copies to the issuing office. |
|---|---|---|---|---|---|

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number: 86-6000662

DUNS Number: 002513422

The purpose of this modification is change medical services, which reduces the per diem rate and add 1500 beds for detention service located at the Eloy Detention Center, Eloy, Arizona on the Inter-Governmental Service Agreement (IGSA) DROIGSA-06-0002.

Continued ...

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| Byron K. Jackson | | Susan D. Erickson | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | 5/14/07 | (Signature of Contracting Officer) | 5/15/07 |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE | OF |
|---|---|---|---|
| | DROIGSA-06-0002/HSCEOP06FIG00D02/P00004 | 2 | 5 |

NAME OF OFFEROR OR CONTRACTOR
ELOY CITY OF

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Delivery: 30 Days After Award<br>Discount Terms:<br>        Net 30<br>Delivery Location Code: ICE<br>Immigration and Customs Enforcement<br>425 I Street NW<br>Rm 2208<br>Washington DC 20536<br><br>FOB: Destination | | | | |
| 0005 | The medical services is no longer required and the daily per diem rate is reduce by $███ from $███ to $███.<br><br>The total amount is decrease and deobligated by $███<br>from $███ to $███.<br><br>The medical services on pages 3 and 4 of the referenced IGSA is changed as follows:<br><br>Remove:<br><br>MEDICAL SERVICES:<br><br>In the even of an emergency, the PROVIDER shall proceed immediately with necessary medical treatment. In such event, the PROVIDER shall notify ICE immediately regarding the nature of the transferred detainee¿s illness or injury and type of treatment provided.<br><br>The PROVIDER agrees to accept and provide for the secure custody, care and safekeeping of detainees in accordance with the State and local laws, standards, policies, procedure, or court orders applicable to the operations of the facility.<br><br>The PROVIDER agrees to provide ICE detainees with the level of medical care and services as appropriate as part of the per diem rate. This rate includes but is not limited to:<br><br>–   On-site sick call, medical appointments/service;<br><br>–   Medication (over the counter/non-legend and<br>Continued ... | | EA | ███ | ███ |

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

| | | | | PAGE | OF |
|---|---|---|---|---|---|
| | | | | 3 | 5 |

**CONTINUATION SHEET** | REFERENCE NO. OF DOCUMENT BEING CONTINUED
DROIGSA-06-0002/HSCEOP06FIG00002/PO0004

NAME OF OFFEROR OR CONTRACTOR
ELOY CITY OF

| ITEM NO.<br>(A) | SUPPLIES/SERVICES<br>(B) | QUANTITY<br>(C) | UNIT<br>(D) | UNIT PRICE<br>(E) | AMOUNT<br>(F) |
|---|---|---|---|---|---|
| | routine drugs and medical supplies); | | | | |

- Escort/Security services for transport
to/from emergency or non-emergency health care
services as either an in-patient or out patient.

When specifically requested by ICE the PROVIDER
agrees to arrange for and /or provide
non-emergency ambulance transportation services
to transport from one off-site medical care
facility to another. ICE agrees to provide
reimbursement, over and above the per diem rate,
to the PROVIDER for such ambulance transportation
services when the costs are included with the
regular monthly billing for detention services.

The PROVIDER agrees to cover all outside medical
costs up to $██████ per event associated with
hospital care services specifically provided to
any detainee.

The PROVIDER shall also notify the designated
contact person at the local ICE offices, when any
reimbursable medical care is provided to a
detainee, in accordance with procedures to be
established and mutually agreed upon.
Notification must be made in advance of treatment
other than in emergency situation.

Replace with:

MEDICAL SERVICES:

The U. S. Public Health Services (USPHS) will be
responsible for providing all health care
services provided under contract for detained
aliens in the custody of ICE. The USPHS shall
provide medical coverage at the facility no less
than twenty-four (24) hours per day, seven (7)
days per week.

The contractor shall provide security with a
minimum of a staff of one at all times. When
patients are housed in the infirmary, a security
guard shall be posted to the unit 24 hours a day,
seven days a week. The contractor shall
coordinate and escort detainees to the medical
clinic for sick call, appointments and pill line.
Note: Optimum functioning of health services
depends on a continuous flow of patients to and
Continued ...

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DROIGSA-06-0002/HSCEOP08HTG00002/P00004 | | | | PAGE 4 | OF 5 |

**CONTINUATION SHEET** — REFERENCE NO. OF DOCUMENT BEING CONTINUED: DROIGSA-06-0002/HSCEOP08HTG00002/P00004 — PAGE 4 OF 5

NAME OF OFFEROR OR CONTRACTOR: ELOY CITY OF

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | from the clinic with an average of one patient per provider every 10 minutes. Throughput for a clinic of this size could be as high as 200+ patients per day. Escort personnel will have to be assigned accordingly. | | | | |
| | The contractor shall provide the detainees written instructions for gaining access to health care services. Procedures shall be explained to all detainees in the detainees' native language, and orally to detainees' who are unable to read. The detainee shall similarly be provided instructions and assistance in personal hygiene, dental hygiene, grooming and health care. It shall be made routinely available. | | | | |
| | The USPHS shall provide for medical screening upon arrival at the facility performed by health care personnel or health trained personnel. | | | | |
| | When communicable or debilitating physical problems are suspected, the detainee shall be separated from the detainee population, and immediately notify USPHS staff. Behavioral problems (detainee who is not diagnosed as psychotic) and suicide observation will be the responsibility of the contractor. | | | | |
| | Written policy and defined procedure shall require that detainee's written health complaints are solicited and delivered to the medical facility for appropriate follow-up. | | | | |
| | Written policy and defined procedure shall require that health care complaints are responded to and that sick call, conducted by USPHS personnel is available to detainees daily. If a detainee's custody status precludes attendance at sick call, arrangements are made to provide sick call services in the place of the detainee's detention. A minimum of one sick call shall be conducted daily. USPHS reserves the right to conduct triage and sick call in the place of the detainee's detention. | | | | |
| | The USPHS shall provide to the contractor and maintain basic first aid kits. First aid kits shall be available at all times and shall be located throughout the facility, as necessary, to allow quick access.<br>Continued ... | | | | |

OPTIONAL FORM 336 (4-86) Sponsored by GSA FAR (48 CFR) 53.110

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED DRDIGSA-06-0002/HSCEOPD0F1GD0002/#00004 | | | | PAGE 5 | OF 5 |
|---|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
ELOY CITY OF

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| | Accounting Info: NONE000 000 BA 31-12-00-000 18-63-0000-00-00-00-00 GE-25-72-00 FPHEAZ DECREASE $ ██████████. Funded: $ | | | | |
| 0006 | Provide additional 1,500 beds for  detention services at Eloy Detention Facility, Eloy, Arizona  The daily rate is $████ for the period of February 1, 2007  through September 30, 2007.  Not To Exceed  of $██████████  All other terms and conditions remain the same  Accounting Info: NONE000 000 BA 31-12-00-000 18-63-0000-00-00-00-00 GE-25-72-00 FPHEA2 Funded: $██████████ | 361518 | LO | ██████████ |

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

**EXHIBIT 3**

**EXHIBIT 3**

Agreement
Between
Eloy, Arizona
And
Corrections Corporation of America

THIS Agreement is made and entered into by and between the City of Eloy, Arizona (the City), a political subdivision of the State of Arizona and Corrections Corporation of America (CCA), a Maryland corporation with its principal offices located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215.

WHEREAS, the City intends to enter into an Intergovernmental Service Agreement (IGA) with the United States Immigration and Customs Enforcement (ICE), a copy of which will be attached hereto as Exhibit A;

WHEREAS, CCA owns the Eloy Detention Facility in Eloy, Arizona (Facility) and desires to house federal inmates at the Facility;

WHEREAS, the federal government has a need for beds at the Facility; and

WHEREAS, the City will benefit from CCA's housing of the government's inmates at the Facility through the creation of jobs and the payment of applicable property taxes:

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, CCA and the City hereby agree as follows:

1. The City shall enter into the IGA with ICE, subject to CCA's advance approval.
2. The City shall place federal inmates at the Facility as directed by the applicable federal entity pursuant to the IGA.
3. For every federal inmate accepted into custody at the Facility, CCA shall provide services in compliance with the terms of the IGA.
4. The City will not amend, terminate or otherwise change the terms of the IGA without the advance written approval of CCA.
5. CCA is not obligated to house federal inmates at the Facility if space is not available or if the IGA is changed without CCA's approval or if the acceptance of inmates would be financially impractical for CCA as determined by CCA.
6. Should CCA desire to seek an increase in per diem from the federal government under the IGA, CCA shall provide all documentation necessary and appropriate to that effort, and the City shall provide all necessary and reasonable cooperation in the pursuit of the increase.
7. CCA shall indemnify, defend and hold harmless the City and its officers and employees from liability and any claims suits, judgments and damages to the extent such claims, suits, judgments and damages arise as a result of CCA's

acts and/or omissions in the performance of this Agreement. Nothing herein shall be construed to require CCA to defend or indemnify any party for any claims, lawsuits, damages, expenses, costs or losses arising from the acts or omissions of the City, its departments, its officers, agents or employees or allegations regarding the City's authority to enter into this Agreement. Neither shall anything herein be construed to require CCA to defend or indemnify any party for any claims, lawsuits, damages, expenses, costs or losses arising from any Habeas Corpus action or other action challenging the validity of a conviction or sentence.

8. The City shall pay CCA the per diem fee paid to the City pursuant to the IGA within 10 working days of the City's receipt of the funds from the government. CCA agrees to submit the necessary documentation for payment as set forth in the IGA. To the extent allowed under the IGA, CCA will be the designated Payee and funds due pursuant to the IGA will be paid directly to CCA.

9. On a monthly basis, CCA shall pay the City an administrative fee of ▇ per day per inmate held at the Facility pursuant to this Agreement and the IGA.

10. The term of this Agreement shall commence on March 1, 2006 and remain in effect thereafter so long as the IGA remains in place unless otherwise terminated.

11. Either party may terminate this Agreement if a breach of the Agreement by the other party remains uncured for sixty (60) days after the date of written notice of the breach.

12. The failure of performance of any of the terms and conditions of the Agreement resulting from acts of God, war, civil insurrection or riot shall not be a breach.

13. The provisions of this Agreement are for the sole benefit of the parties hereto and shall not be construed as conferring any rights on any other person or entity, including but not limited to, inmates held pursuant to the IGA.

14. This Agreement shall be interpreted under the laws of the State of Arizona.

15. This Agreement shall not be altered, changed or amended except in writing signed by both parties.

16. This Agreement incorporates all the agreements, covenants and understandings between the parties. No prior contract or understandings, verbal or otherwise, of the parties and/or their agents shall be valid or enforceable unless embodied in this Agreement.

17. All notices sent pursuant to this Agreement shall be sent certified mail, return receipt requested to:

City:


CCA:     G.A. Puryear, IV
         General Counsel
         Corrections Corporation of America

                10 Burton Hills Boulevard
                Nashville, TN 37215

And      Warden
                Eloy Detention Center
                1705 East Hanna Road
                Eloy, Arizona 85231

18.    No waiver of any breach of the terms or conditions of this Agreement shall be a waiver of any other or subsequent breach, nor shall any waiver be valid or binding unless the same shall be in writing signed by the party charged.

CITY OF ELOY

By: _____     Date: _____02/14/06_____

CORRECTIONS CORPORATION OF AMERICA

By: _____     Date: _____2/17/06_____
    Damon T. Hininger, CCA Vice President
    Federal Customer Relations

**EXHIBIT 4**

**EXHIBIT 4**

**OFFICE OF INSPECTOR GENERAL**

# Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services



**February 21, 2018**

**OIG-18-53**



# DHS OIG HIGHLIGHTS
## *Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services*

**February 21, 2018**

## Why We Did This Audit

U.S. Senator Claire McCaskill asked us to review ICE's modification of its intergovernmental service agreement (IGSA) with the City of Eloy in Arizona to procure family detention space in Dilley, Texas. We also reviewed other selected IGSAs to determine whether they complied with applicable laws and regulations.

## What We Recommend

ICE should 1) establish procedures for IGSAs that implement Federal purchasing guidelines; and 2) discontinue modifying the Eloy IGSA to procure family detention space at the South Texas Family Residential Center.

**For Further Information:**
Contact our Office of Public Affairs at (202) 254-4100, or email us at
DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

U.S. Immigration and Customs Enforcement (ICE) is responsible for the detention of removable aliens. ICE commonly uses a type of agreement called an IGSA to reserve space at detention facilities owned or operated by state or local governments.

In September 2014, ICE improperly modified an existing IGSA with the City of Eloy (Eloy) in Arizona to establish the 2,400-bed South Texas Family Residential Center in Dilley, Texas, more than 900 miles away. Although ICE could have contracted directly with the private company that operates the South Texas Family Residential Center, CCA, it instead created an unnecessary "middleman" by modifying its existing IGSA with Eloy. Eloy's sole function under the modification is to act as the middleman between ICE and CCA; Eloy collects about $438,000 in annual fees for this service.

In addition, ICE's policies and procedures for negotiating, executing, and modifying IGSAs are insufficient and lack specific guidance for the appropriate use of IGSAs. Consequently, ICE may have overpaid for detention services at the South Texas Family Residential Center, as well as other detention facilities. Moreover, ICE has no assurance that it executed detention center contracts in the best interest of the Federal Government, taxpayers, or detainees.

## ICE Response

ICE concurred with recommendation 1 and non-concurred with recommendation 2. ICE will undertake an effort to ensure its written procedures implement Federal guidelines. ICE believes that its modification of the City of Eloy IGSA was proper and therefore future modifications also would be proper.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

FEB 21 2018

MEMORANDUM FOR:   Thomas D. Homan
                  Acting Director
                  Immigration and Customs Enforcement

FROM:             John V. Kelly
                  Acting Inspector General

SUBJECT:          *Immigration and Customs Enforcement Did Not Follow
                  Federal Procurement Guidelines When Contracting for
                  Detention Services*

For your action is our final report, *Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services.* We incorporated the formal comments from your office in the final report. The report contains two recommendations aimed at improving DHS' processes for detention center contracting. DHS concurred with the first recommendation and non-concurred with the second. Based on information provided in your response to the draft report, we consider the first recommendation resolved and open and the second recommendation unresolved and open. Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions and of the disposition of any monetary amounts. Please send your closure request to OIGAuditsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act,* we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Donald Bumgardner, Deputy Assistant Inspector General for Audits, at (202) 254-4100, or Lisa Vonder Haar, Audit Director at (202) 254-4143.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Background

U.S. Immigration and Customs Enforcement (ICE) promotes homeland security and public safety by enforcing Federal laws governing border control, customs, trade, and immigration. ICE's responsibilities include the detention of removable aliens[1] who present a flight risk, a threat to public safety, or fall within mandatory detention requirements.

In fiscal year 2016, ICE received about $2.3 billion to house detainees at 203 detention facilities nationwide. ICE owns and operates five of these detention facilities. It secured the remainder by contracting directly with private companies, establishing intergovernmental agreements with the U.S. Marshal Service, or negotiating intergovernmental service agreements (IGSA)[2] with state and local governments. IGSAs enable ICE to use bed space in city, county, or state detention facilities. The state and local governments may manage the facilities and detention services directly or use subcontractors. As with other types of agreements, ICE may renegotiate or "modify" IGSAs to meet changing needs for detention space.

In 2014, a surge of families and unaccompanied minors crossing the Southwest border created an urgent need for family detention space. To help meet this need, ICE modified an existing IGSA for adult detention with the City of Eloy (Eloy) in Arizona to create the South Texas Family Residential

**Location of Eloy, Arizona, and Dilley, Texas**



*Source:* Google Maps

Center in Dilley, Texas (South Texas Modification). The resulting residential center —now the largest ICE detention facility in the Nation — is more than 900 miles from Eloy.

U.S. Senator Claire McCaskill asked us to review the South Texas Modification. We also reviewed other selected IGSAs to determine whether they complied with applicable laws, regulations, and agreements.

---

[1] A person who is subject to removal as specified in the *Immigration and Naturalization Act*. This includes any alien illegally in the United States, regardless of whether the alien entered the country by fraud, misrepresentation, or other illegal means; or entered legally but subsequently violated the terms of his or her nonimmigrant status classification.
[2] ICE staff also use the acronym "IGSA" as a general term to describe some detention facilities. In this report, "IGSA" refers to the specific procurement agreement.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Results of Audit

ICE improperly modified its IGSA with the City of Eloy in Arizona to include the South Texas Family Residential Center in Dilley, Texas. In addition, ICE's policies and procedures for negotiating, executing, and modifying IGSAs are insufficient and lack specific guidance for the appropriate use of IGSAs. Consequently, ICE may have overpaid for detention services at the South Texas Family Residential Center, as well as other detention facilities. Moreover, ICE has no assurance that it executed detention center contracts in the best interest of the Federal Government, taxpayers, or detainees.

### ICE Improperly Modified an Existing IGSA to Provide New Family Detention Facilities

Although ICE should have contracted directly with the private company that operates the South Texas Family Residential Center, CCA,[3] it instead created an unnecessary "middleman" by modifying its existing IGSA with Eloy. The modification was improper for two reasons: 1) the terms of the IGSA were negotiated directly with Eloy's existing subcontractor, CCA, instead of the party legally responsible for the agreement (Eloy); and 2) the addition of family detention services was outside the scope of the original IGSA.

In 2006, ICE executed the original IGSA with Eloy to provide housing for up to 1,500 adult immigration detainees at the Eloy Detention Center in Eloy, Arizona. Eloy subcontracted with CCA, which owns and operates the facility, to house male and female detainees at a mix of minimum and medium security levels.

In July 2014, following a surge of families and unaccompanied minors crossing the Southwest border, ICE's Office of Acquisition asked two private companies to submit proposals for family detention facilities in southern Texas, with a 2,000- to 4,000-bed capacity. One of the companies declined to submit a proposal. The other, CCA, presented a proposal and entered into negotiations with ICE to construct and operate the South Texas Family Residential Center through a modification of the Eloy IGSA. ICE worked directly with CCA to develop the requirements for the facility; Eloy did not participate in developing the requirements or any other aspect of the negotiations with ICE.

After reviewing CCA's proposal, ICE's Commercial and Administrative Law Division (CALD) within the Office of the Principal Legal Advisor issued a

---

[3] CCA was formerly known as Corrections Corporation of America. In late 2016, it rebranded its corporate enterprise as "CoreCivic," but continues to use the acronym "CCA."



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

memorandum[4] warning the Director and Head of Contracting that the South Texas Modification was not legally advisable. The memorandum also stated, "…needed detention services can be procured expeditiously using available procurement tools." Furthermore, CALD concluded that the proposed modification of the Eloy IGSA was likely outside the scope of the original IGSA because it would include "work at a facility that is 900 miles away by a subcontractor (CCA) over whom Eloy will exercise minimal operational control." The contracted service requirements for housing children and families at the South Texas Family Residential Center in Dilley are also beyond the scope of the original IGSA. The original IGSA called for Eloy to operate a detention facility that housed adults. We believe that the care of children and families included in the modification is substantially different.

**Eloy Detention Center**     **South Texas Family Residential Center**

  

*Source:* Defense Video Imagery Distribution System Photos by Charles Reed

Nevertheless, ICE continued negotiating exclusively with CCA, establishing the housing layout and pricing schedule, without input from Eloy. Then, on September 22, 2014, CCA officials attended Eloy's City Council meeting to request the City modify its IGSA with ICE to include the South Texas Family Residential Center; Eloy agreed. The next day, ICE executed the South Texas Modification and Eloy subsequently contracted with CCA to provide the actual detention services for up to 48 months. Eloy's sole function under the modification is to act as the middleman between ICE and CCA; Eloy collects about $438,000 in annual fees for this service. ICE pays for each of the 2,400 beds in the South Texas Family Residential Center whether they are occupied or not. As of September 2016, ICE paid about $261 million to house families and unaccompanied minors in the South Texas facility.

According to ICE's Office of Acquisition staff, it was more expedient to modify the Eloy IGSA than contract directly with CCA. In addition, ICE program and

---

[4] "Review of Discussed Courses of Action for an Intergovernmental Services Agreement in Carrizo Springs and Dilley, Texas," dated July 30, 2014.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

acquisition officials said that IGSAs offered them much greater flexibility than a traditional procurement agreement.

In August 2016, Office of Acquisition staff said that ICE would not fund the South Texas modification beyond September 2016. However, in October 2016, ICE modified the Eloy IGSA to extend its use of the South Texas Family Residential Center until 2021, 3 years longer than the original agreement. Although the October 2016 modification eliminated early termination fees, we believe ICE should have executed a new agreement directly with CCA. The October 2016 modification is improper for the same reasons as the September 2014 modification. Appendix B contains a timeline of the events related to the South Texas Modification.

**ICE Does Not Have Sufficient Policies or Guidance for IGSAs**

There are three types of procurement instruments available to Federal executive agencies for obtaining supplies and services — grants, cooperative agreements, and procurement contracts. IGSAs are not grants. However, ICE has not formally defined IGSAs as cooperative agreements or procurement contracts, and does not follow Office of Management and Budget's uniform administrative requirements for Federal awards (2 Code of Federal Regulation (CFR) Part 200) or Federal Acquisition Regulations (FAR) for procurement contracts. In the absence of Federal guidelines, ICE should have developed policies and procedures for negotiating, executing, and modifying IGSAs.

Without standard operating procedures for IGSAs, ICE cannot ensure it executes IGSAs properly, consistently, or efficiently. For example, in one IGSA we reviewed, a retiring contracting officer did not maintain any documentation to support awarding the IGSA because ICE did not have a standard for document retention. As a result, the new contracting officer needed to repeat all the pre-award actions.

Additionally, ICE is not in compliance with the Office of Management and Budget's Circular A-123, *Management's Responsibility for Enterprise Risk Management and Internal Control*, which requires Federal agencies to establish and maintain controls (policies and procedures) related to operations, reporting, and compliance with relevant laws and regulations.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Conclusion**

In general, ICE has no assurance that it executed detention center contracts in the best interest of the Federal Government, taxpayers, or detainees. It appears that ICE deliberately circumvented FAR provisions by modifying its IGSA with Eloy, rather than contracting directly with CCA. Because ICE's agreement and legal relationship is with the City of Eloy, CCA's performance is effectively insulated from government scrutiny. As such, ICE has no assurance that the South Texas Modification was in the best interest of the Federal Government, taxpayers, or detainees.

## Recommendations

**Recommendation 1.** We recommend that the Deputy Director of ICE establish and communicate specific written procedures for IGSAs implementing Federal guidelines that include:

- a definition of an IGSA and determination of whether it is a cooperative agreement or procurement contract,
- administrative requirements for the solicitation and award of IGSAs,
- post-award requirements,
- guidelines for modifications, and
- allowable cost structure.

**Recommendation 2**. We recommend that ICE discontinue modifying the Eloy IGSA to procure family detention space at the South Texas Family Residential Center and use the procedures developed in recommendation 1 to procure necessary housing for family detention.

## Management Comments and OIG Analysis

ICE concurred with recommendation 1 and non-concurred with recommendation 2. In addition to its response to our recommendations, ICE included a cover letter disputing the findings in our report. A summary of ICE's comments and our analysis follows. Appendix A is ICE's verbatim response to this report, and our analysis of ICE's general comments is presented in appendix C. ICE also provided technical comments to the draft report, which we incorporated, as appropriate.

ICE officials believe the modification to the Eloy IGSA was proper because 8 United States Code (U.S.C.) § 1103(a)(11)(A) authorizes them to use IGSAs for detention services. ICE believes IGSAs are exempt from the Competition in Contracting Act and FAR. ICE further believes the services provided at the South Texas Residential Facility are within the scope of the original City of Eloy



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

IGSA. Additionally, ICE contends that the contracting officer's actions ensured that it obtained a reasonable price and executed the IGSA in the best interest of the Federal Government, taxpayers, and detainees.

OIG did not question ICE's authority to use IGSAs or its continuing need to use the South Texas Family Residential Center. We believe the modification of the IGSA with the City of Eloy was improper, as discussed in the report. Eloy's sole function under the modification is to act as the middleman, for which it collects about $438,000 in annual fees.

## ICE Comments to Recommendation 1

ICE concurred with this recommendation. ICE said its Office of Acquisition has established specific written procedures for negotiating, establishing, and administering IGSAs. ICE agreed to undertake an effort to ensure the procedures address the bulleted list of items in recommendation 1, which ICE labeled a–e. ICE also stated the ICE Contract and Acquisition Procedures (ICECAP) 07.08 provided a definition of IGSAs and established standard IGSA templates for solicitations, post-award requirements, and modifications.

## OIG Analysis of ICE Comments

The development and implementation of written policy and procedures that incorporate the bulleted list of items in recommendation 1, which ICE labeled a-e, would meet the intent of the recommendation. ICE stated its contract and acquisition procedures, specifically ICECAP 07.08, established policy governing IGSAs. However, according to ICE's Deputy Assistant Director for Acquisition Policy and Procedures, ICE is not using ICECAPs, including ICECAP 07.08, and ICE was in the process of developing procurement policies. In addition, ICE should clearly communicate to staff its current and enforceable policies (templates and checklists are not adequate policy documents). This recommendation is resolved and open.

## ICE Comments to Recommendation 2

ICE non-concurred with this recommendation. ICE responded that it modified its IGSA with the City of Eloy in accordance with the terms and conditions of the existing IGSA with Eloy. ICE further cites its statutory authority to use IGSAs and asserts it has written procedures and guidance for negotiating, establishing, and administering IGSAs. ICE requested that the Office of Inspector General (OIG) consider this recommendation resolved and closed.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**OIG Analysis of ICE Comments**

We consider ICE's response to recommendation 2 unresponsive. OIG did not question ICE's authority to use IGSAs or a continuing need to use the South Texas Family Residential Center. We believe the modification of the IGSA with the City of Eloy was improper as discussed in this report. ICE also states it has written procedures and guidance for negotiating, establishing, and administering IGSAs. However, as noted previously, we do not consider templates and checklists sufficient. This recommendation is unresolved and open.

## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107–296) by amendment to the *Inspector General Act of 1978*.

Our objective was to determine whether the modification and management of ICE's contract with the City of Eloy, Arizona, as well as other selected detention center contracts, comply with applicable laws, regulations, and agreements. To achieve our objective, we reviewed documents included in the contract files for the selected sample. This included pre-award documentation, the IGSA, modifications, and oversight of performance.

We reviewed a judgmental sample of 10 IGSAs for detention services selected from ICE's "facilities list." We performed data reliability tests on the facilities list provided by ICE and identified discrepancies with the data. We determined the discrepancies did not affect our judgmental sample and the number of IGSAs was sufficient for our review. We based our conclusions on the documentation and records we analyzed from ICE.

We interviewed ICE personnel from Office of Acquisition, Office of Acquisition Policy and Oversight, Office of Custody Management, Office of the Principal Legal Advisor, Office of Financial Management, Office of Budget Policy and Performance, and Office of Detention Policy and Planning. We reviewed applicable Federal laws, regulations, codes, and minimum requirements pertaining to ICE detention center contracts. We also completed a review of departmental and component policies, procedures, and internal directives established by DHS and ICE to ensure they meet specified requirements.

We assessed ICE's control structure, policies, procedures, and practices applicable to IGSAs. Our assessment would not necessarily disclose all material weaknesses in this control structure; however, it disclosed



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

weaknesses in ICE's internal policies and procedures governing IGSAs. These weaknesses are discussed in the body of this report.

We conducted this performance audit between October 2015 and November 2016 pursuant to the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our audit objectives.

The Office of Audits major contributors to this report are Lisa Vonder Haar, Director; Karen J. Gardner, Audit Manager; Duane Albert, Program Analyst; Thomas J. Bobrowski, Program Analyst; Douglas Bozeman, Program Analyst; Elizabeth Finn, Program Analyst; Kevin Dolloson, Communications Analyst; and Adam Buro, Independent Referencer.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Appendix A
# ICE Comments to the Draft Report

*Office of the Director*
**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

January 8, 2018

MEMORANDUM FOR:    John V. Kelly
                          Acting Inspector General

FROM:    Thomas D. Homan
               Deputy Director and
               Senior Official Performing the Duties of the Director
               U.S. Immigration and Customs Enforcement

SUBJECT:    Management Response to Draft Report "Immigration and Customs
               Enforcement Did Not Follow Federal Procurement Guidelines when
               Contracting for Detention Services" (Project No. 15-124-AUD-ICE)

Thank you for the opportunity to review and comment on this draft report. U.S. Immigration and Customs Service (ICE) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

ICE disagrees with certain findings and conclusions made by OIG. In particular, we believe the report inaccurately describes the legal basis for ICE's Intergovernmental Service Agreement (IGSA) authority and does not acknowledge the unique circumstances and challenges ICE faced in responding to the 2014 surge of families crossing the border, an unprecedented situation which persists to this day. ICE acknowledges that issues surrounding our unique IGSA authority are technically complex, but the report's suggestion that ICE can only procure detention beds through Federal Acquisition Regulation (FAR)-based contracting is simply incorrect. In fact ICE regularly uses its IGSA authority to acquire detention beds, as this unique statutory authority allows ICE to acquire beds quickly and in remote locations where much of our enforcement actions occur. While the acquisition of beds for family detention through an IGSA may not be well understood outside the immigration enforcement community, it is by no means improper or illegal.

As the draft report correctly notes: (1) ICE is responsible for the detention of removable aliens; and (2) ICE faced a major surge of families and unaccompanied minors crossing the Southwest border during 2014, which created an *urgent and compelling* need for family detention space. The resolution of this crisis became a Secretary of Homeland Security priority, and the ICE Office of Acquisition Management (OAQ) used the contractual flexibilities afforded by its broad IGSA authority to meet this need.

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE Management Response to Recommendations Contained in 15-124-AUD-ICE
Page 2 of 7

ICE's IGSA authority is codified at 8 U.S.C. § 1103(a)(11)(A), which provides that the U.S.
Department of Homeland Security (DHS) may enter into agreements with a State, or its
subdivisions, "for necessary clothing, medical care, necessary guard hire, and the housing, care,
and security of persons detained by [ICE] pursuant to Federal law . . . ." ICE relies on this
authority for a significant number of its detention contracts. Given this express authorization
provided under federal immigration law, ICE has no legal requirement to compete the award of
an IGSA because 8 U.S.C. § 1103(a)(11)(A) serves as an exception to the Competition in
Contracting Act (CICA) requirement for full and open competition. CICA provides that its
competition requirements do not apply when "a statute expressly authorizes or requires that the
procurement be made through another [executive] agency or from a specified source." 41 U.S.C.
§ 3301(a)(1). Further, unlike the IGSA authority of the Department of Defense (DoD), 10
U.S.C. § 2679(a)(4), neither ICE nor the IGSA holder is required to competitively award any
contracts or subcontracts awarded under the IGSA.[1] Like DoD, ICE's IGSAs are not generally
required to follow the Federal Acquisition Regulation (FAR).[2]

In addition, an IGSA is not a cooperative agreement.[3] A cooperative agreement is used to
transfer a thing of value to a State, local government or other entity, whereas a procurement
contract is used when the principal purpose is to obtain services or property, by purchase, lease
or barter, for the direct benefit or use of the United States.[4] Despite the OIG's conclusion ICE
has never defined IGSAs nor followed the FAR and or federal contracting guidelines contained
in part 200 of Title 2 of the Code of Federal Regulations, both ICE OAQ and the Office of the
Principal Legal Advisor (OPLA) have long taken the position that an IGSA is a type of
procurement rather than a cooperative agreement.[5]

The draft report cites two reasons why the OIG believes ICE improperly modified its IGSA with
the City of Eloy, in Arizona: (1) the terms of the IGSA were negotiated directly with Eloy's

---

[1] Major Erik J. Zoll, *Intergovernmental Support Agreements: A Primer for the Field*, The Army Lawyer, (June 2017), at 43 (discussing how the DoD IGSAs are exempt from CICA); Michael J. Davidson, *CICA's Sam Exception*, 53 The Procurement Lawyer, 3, and 5-6 (Fall 2017) (discussing ICE IGSA authority and exemption from CICA).

[2] Zoll, *supra* note 1, at 42-43; Davidson, *supra* note 1, at 3, 5. *See also Board of County Commissioners of the County of Bernalillo v. United States*, 93 Fed. Cl. 228, 234 (2010) (detention services in an intergovernmental contract between the office of the Federal Detention Trustee and Bernalillo County was not subject to the FAR); ICE Contracting and Acquisition Procedures (ICECAP) 07.08, *Inter-Governmental Service Agreements (IGSA)* ¶2(a) (Aug. 28, 2007). Although not FAR-based, IGSAs are governed by law and regulations concerning the obligation and expenditure of appropriated funds and hence subject to the DHS Acquisition Manual and OMB Circular A-87, *Cost Principles for State, Local and Indian Tribal Governments*, codified at 2 C.F.R. part 225, which ICE OAQ uses when determining a bed-day rate.

[3] A July 30, 2014 unsigned memorandum from Song Kim, Acting Chief, Commercial and Administrative Law Division (CALD), OPLA, ICE, to Bill Weinberg, Director and Head of Contracting Activity, OAQ, ICE, does not represent the longstanding views of OAQ and the OPLA that IGSAs are statutorily authorized as a contract vehicle available for acquiring detention services in support of the ICE immigration enforcement mission.

[4] *See Assisted Housing Services Corp. et al.*, B-406738, et seq., 2012 CPD ¶ 236 (Aug. 15, 2010).

[5] See memorandum from Michael J. Davidson, Chief, CALD, OPLA, ICE, to William C. Randolph, Director and Head of Contracting Activity, OAQ, ICE, *Funding Intergovernmental Service Agreements* 1 n.1 (Feb. 7, 2013); ICECAP 07.08, *supra* note 2, at ¶ 2(a) ("IGSAs are not grants or cooperative agreements").



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE Management Response to Recommendations Contained in 15-124-AUD-ICE
Page 3 of 7

existing subcontractor CCA, instead of the party legally responsible for the agreement (Eloy); and (2) the addition of family detention services was outside the scope of the original IGSA.

ICE contends that the modification to the Eloy IGSA was proper.  ICE is statutorily authorized to utilize IGSAs for detention services, and IGSAs are exempt from both the CICA and the FAR.  Assuming the IGSA contracting partner consents, ICE is unaware of any legal prohibition against negotiating contractual terms with an IGSA subcontractor.  Further, given the non-applicability of CICA and the FAR, ICE is free to take advantage of the broad flexibilities afforded by its IGSA authority to modify the terms of the original agreement.  At the time of the IGSA modification, ICE was neither under a legal obligation to compete the detention contract within the commercial marketplace nor subject to the normal CICA/FAR requirements on modifications of contracts.  Therefore, ICE has authority to noncompetitively enter into an IGSA for detention services and to negotiate the IGSA terms directly with Eloy's subcontractor, CCA.  Further, the addition of family detention services was consistent with the scope, intent, and framework of the original IGSA.

As far back as 1999, the former Immigration and Naturalization Service (INS) utilized established acquisition procedures for entering into IGSAs for the same detention services.[6]  These foundational guidelines continue to serve as an important part of the groundwork for the current ICE IGSA acquisition procedures outside of the FAR framework.  As explained in Immigration and Naturalization Service Acquisition Procedures (INSAP) 04-02, in 1982 the Office of Management and Budget recognized the unique nature of the federal detention marketplace, and issued a memorandum to the Department of Justice authorizing the INS, the Bureau of Prisons, and the U.S. Marshals Service (USMS), to process jail agreements outside of the FAR.  The INS relied on this memorandum until 1996, when statutory language was added to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,[7] authorizing the use of IGSAs for immigration detention.  The ICE Contract and Acquisition Procedures (ICECAP) replaced INSAP, and on May 25, 2010, ICE issued ICECAP 10.08 R1, establishing updated policy and procedures for establishing IGSAs.[8]

By their very nature, detention center requirements are unpredictable and often urgent and compelling, and ICE's use of its unique IGSA authority to procure detention space operates differently from traditional FAR-based procurements.  The scope of the detention center IGSA vehicle may be broad and/or in flux as requirements change, but the rigorous contracting procedures and leadership oversight applied to these procurements remain steadfast.  To that end, ICE is always receptive to improving its acquisition procedures.  ICE OAQ acquisition policies are contained in its legacy ICECAPs and the ICE Contracting Supplement.  ICECAP 10.08 R1, *Inter-Governmental Service Agreements*, outlines the policies and procedures for negotiating and awarding an IGSA and is available as a guide for ICE OAQ employees to follow when negotiating an IGSA.  As outlined in ICECAP 10.08 R1, ICE OAQ has a standard IGSA package for new IGSA awards that includes: the Jail Services Cost Statement (JSCS), Performance Work Statement, Quality Assurance and Surveillance Plan, DHS Prison Rape Elimination Act, security

---

[6] INSAP-04-02, Acquisition Procedures for Inter-Governmental Service (Jail) Agreements (May 3, 1999).

[7] Pub. L. No. 104-208, 1120 Stat. 3009-546.

[8] The ICECAP was not applicable to Inter-Governmental Agreements awarded by the U.S. Marshals Service.

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE Management Response to Recommendations Contained in 15-124-AUD-ICE
Page 4 of 7

requirements, multiple medical requirements, and the basic IGSA statement of work. The service provider is responsible for filling out the JSCS and submitting it to ICE to substantiate costs associated with providing detention services. The JSCS captures total personnel costs, total personnel benefits, total consultant and contract services, other direct operating costs, indirect costs, equipment depreciation costs, and building depreciation costs of the service provider for a given fiscal year. A formula within the JSCS then calculates the proposed bed day rate based on those costs. The completed JSCS is evaluated by the Contracting Officer in conjunction with the ICE/ERO Detention Planning and Acquisition Unit (DPAU) to determine allowable and unallowable costs and ultimately to decide whether the bed-day rate proposed is fair and reasonable based on the cost data supplied.

ICE OAQ executes detention center contracts and IGSAs in the best interest of the Federal Government, taxpayers, and detainees. Before an IGSA is awarded, ICE must conduct an analysis of possible detention space alternatives. This includes identifying whether any state or local detention facilities as well as any existing ICE IGSA or USMS Inter-Governmental Agreement, is available. The requirements are vetted and refined through multiple program offices within ICE before it reaches OAQ. After the requirement reaches OAQ, extensive negotiations occur between OAQ and the service provider until an acceptable agreement is reached. The service provider is required to submit documentation to the government to allow for input from the government's technical experts. This includes representatives from ICE's Enforcement and Removal Operations, including the DPAU and ICE Health Service Corps, and the ICE Office of the Chief Financial Officer, including the Office of Budget and Program Performance to ensure that ICE is obtaining services that represent the best value to the government, taxpayers and detainees. For this particular modification to the City of Eloy IGSA, several discussions were held with senior-level contracting leadership and ICE senior leadership to discuss concerns, assess risk, and identify the best path forward for this procurement.

The initial scope of the IGSA with the City of Eloy was for the housing, care, and security of persons detained by ICE, which aligns with ICE's statutory IGSA authority. The modification adding family detention services (Modification P00010) was well within the scope of the Eloy IGSA. The only difference is that Modification P00010 would provide for the care of families (women and children) in accordance with the Family Residential Standards. Thus, Modification P00010 was a bi-lateral modification that expanded the population that would be detained from all males to include families, still within the initial scope of the Eloy IGSA. Even assuming Modification P00010 was deemed out-of-scope, the flexibilities associated with ICE's IGSA authority would have still permitted such a modification.

In the case of the family detention IGSA with the City of Eloy, ICE OAQ has documented the negotiations and determined that the price was fair and reasonable using, as a guideline, the established contracting procedures of FAR Part 15 principles. As with any IGSA, the Contracting Officer made a determination of "fair and reasonable" price (which is a price that is fair to both the buyer and seller, given the requirement and current conditions). As the draft report recognizes, the contract was negotiated at a time when DHS was responding to an unprecedented border surge and ICE had an urgent need for additional detention services. ICE was able to obtain a reasonable price through negotiations with the vendor. Through four weeks of negotiations prior to award, ICE achieved price reductions and was able to eliminate some elements of risk. Although risk remained at the initiation of this contract due to circumstances

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ICE Management Response to Recommendations Contained in 15-124-AUD-ICE
Page 5 of 7

surrounding large-scale border crossings at the time, as the risk has decreased over time OAQ has continued to explore opportunities for cost savings at this facility. In fact, a later bi-lateral modification (P00027) reduced the monthly firm-fixed price for 2,400 beds significantly. Given the unique conditions and requirements for family detention, the price ICE is paying for use of beds at this facility is fair and reasonable.

The Contracting Officer's Memorandum to File documents the background and rationale for modifying the existing IGSA with the City of Eloy to add family detention services at Dilley, Texas. In July 2014, OAQ issued a request for proposals to two vendors, GEO and CCA, for an up-to-2,000-bed facility to detain illegal alien families in ICE custody. Only CCA responded, offering a proposal to modify the IGSA with the City of Eloy. Under the Eloy IGSA, CCA is the service provider and responsible for providing the facility and detention services at the Eloy Detention Center. CCA operates as a sub-contractor on the Eloy IGSA and has a separate agreement with Eloy outlining its relationship with Eloy. The City of Eloy authorized CCA to speak with ICE on behalf of Eloy as it relates to detention services provided under the IGSA. After reviewing all the alternatives and discussions with OPLA, the Contracting Officer determined that modifying the Eloy IGSA to provide family detention services in Dilley, Texas, was not statutorily prohibited.

The draft report contained two recommendations, one with which ICE concurs and one with which it non-concurs. Attached find our detailed response to each recommendation. Technical comments were previously provided under separate cover.

Thank you again for the opportunity to comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Attachment
- ICE Management Response to Recommendations Contained in 15-124-AUD-ICE

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

### Attachment: U.S. Immigration and Customs Enforcement (ICE) Management Response to Recommendations Contained in 15-124-AUD-ICE

OIG recommended that:

**Recommendation 1:** The Deputy Director of ICE establish and communicate specific written procedures for Intergovernmental Service Agreements (IGSAs) implementing Federal guidelines that include:

   a. A definition of an IGSA and determination of whether it is a cooperative agreement or procurement contract;
   b. Administrative requirements for the solicitation and award of IGSAs;
   c. Post-award requirements;
   d. Guidelines for modifications, and;
   e. Allowable cost structure.

**Response:** Concur. ICE's Office of Acquisition Management (OAQ) has established specific written procedures for negotiating, establishing, and administering IGSAs, but agrees that it will undertake an effort to ensure the procedures address each of the areas outlined in this recommendation, as appropriate.

It is important to recognize, however, that ICE Contracting and Acquisition Procedure (ICECAP) 07.08 defines an IGSA and discusses in detail ICE's authority to enter into IGSAs with non-federal government entities to house immigration detainees. This guidance clearly states that an IGSA is not a cooperative agreement and makes it clear that IGSA are not acquisitions governed by the FAR. Rather, IGSAs function as a form of fixed-price, indefinite quantity, indefinite delivery type contract, some of which include a monthly guaranteed minimum.

In addition, ICECAP 07.08 states the IGSAs are not usually competed; rather, ICE identifies an available non-federal government entity that could provide detention services, negotiates terms and a price for the services, and then enters into an IGSA. It is the legal opinion of the ICE Office of the Principal Legal Advisor that IGSAs are exempt from the competition requirements of the Competition in Contracting Act (CICA) and the Federal Acquisition Regulation (FAR).

ICE has also established standard templates for IGSA solicitations including a streamlined Jail Services Cost Statement (JSCS) to ensure payment of a fair and reasonable price. The process for handling post-award requirements and modifications are included in the language of the standard IGSA template.

Further, ICECAP 07.08 states that IGSAs are subject to OMB Circular A-87, *Cost Principles for State, Local and Indian Tribal Governments*, codified at 2 C.F.R. § 225. The JSCS, previously discussed, calculates a bed-day rate based on allowable costs in a given fiscal year based on cost data supplied by the IGSA contracting partner. The JSCS template supplied to vendors also includes a certification statement acknowledging that costs prohibited by OMB Circular A-87 are not allowed to be charged.

Estimated Completion Date: April 30, 2018.

# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

ICE Management Response to Recommendations Contained in 15-124-AUD-ICE
Page 7 of 7

**Recommendation 2:**  ICE discontinue modifying the Eloy IGSA to procure family detention space at the South Texas Family Residential Center and use the procedures developed in Recommendation 1 to procure necessary housing for family detention.

**Response:**  Non-concur.  ICE disagrees with the recommendation to discontinue modifying the Eloy IGSA for family detention services at the STFRC.  ICE modified its IGSA with the City of Eloy to provide care and housing of families in ICE custody at the STFRC in Dilley, Texas, in accordance with the terms and conditions of its existing IGSA with Eloy.  ICE has statutory authority at 8 U.S.C. § 1103(a)(11)(A) to procure detention services through IGSAs.  IGSAs are not governed by the FAR or subject to the full and open competition requirements under CICA.  In addition, ICE has written procedures and guidance about how to negotiate, establish and administer IGSAs, which were followed and are currently being reviewed and updated (in response to Recommendation 1), as appropriate.  We request that OIG consider this recommendation resolved and closed.

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## South Texas Modification Timeline

| Date | Event |
|------|-------|
| **February 2006** | • ICE executed an intergovernmental service agreement (IGSA) with the City of Eloy to house adult detainees in the Eloy Detention Center. Eloy subcontracted with CCA (CoreCivic, formerly known as Corrections Corporation of America) to manage the Eloy Detention Center. |
| **2006-2014** | • ICE housed adult detainees in the Eloy Detention Center according to the terms of the IGSA. Eloy continued to subcontract with CCA. |
| **February 2013** | • ICE's Commercial and Administrative Law Division issued a memo stating that IGSAs are not governed by the Federal Acquisition Regulation (FAR). |
| **2014** | • The United States experienced a surge of unaccompanied minors and families crossing the Southwest border. |
| **July 2014** | • ICE requested proposals for a family detention center in South Texas from two contractors. |
| **July 2014** | • CCA submitted a proposal. The other contractor declined. |
| **July 2014** | • ICE's Commercial and Administrative Law Division concluded that modifying Eloy's IGSA to include the South Texas Family Residential Center was not legally advisable. |
| **August 2014** | • ICE negotiated the housing layout and pricing schedule directly with CCA. |
| **September 2014** | • On September 22, 2014, CCA officials attended Eloy's City Council meeting to request the City modify its IGSA with ICE to include the South Texas Family Residential Center. |
| **September 2014** | • On Sepember 23, 2014, ICE signed modification 10 to Eloy's IGSA, incorporating the South Texas Family Residential Center in Dilley, Texas. The terms of modification 10 apply only to the South Texas facility. |
| **October 2016** | • ICE modified the terms and conditions of Eloy's IGSA related to the South Texas facility, increasing the ordering period from 48 to 84 months. |

*Source:* OIG derived from ICE documents



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C
## ICE Comments to Draft Report with OIG Rebuttal

January 8, 2018

MEMORANDUM FOR: John V. Kelly
Acting Inspector General

FROM: Thomas D. Homan
Deputy Director and
Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement

SUBJECT: Management Response to Draft Report "Immigration
and Customs Enforcement Did Not Follow Federal
Procurement Guidelines when Contracting for
Detention Services" (Project No. 15-124-AUD-ICE)

Thank you for the opportunity to review and comment on this draft report.
U.S. Immigration and Customs Service (ICE) appreciates the work of the Office
of Inspector General (OIG) in planning and conducting its review and issuing
this report.

ICE disagrees with certain findings and conclusions made by OIG. In
particular, we believe the report inaccurately describes the legal basis for ICE's
Intergovernmental Service Agreement (IGSA) authority and does not
acknowledge the unique circumstances and challenges ICE faced in responding
to the 2014 surge of families crossing the border, an unprecedented situation
which persists to this day. ICE acknowledges that issues surrounding our
unique IGSA authority are technically complex, but the report's suggestion that
ICE can only procure detention beds through Federal Acquisition Regulation
(FAR)-based contracting is simply incorrect. In fact ICE regularly uses its IGSA
authority to acquire detention beds, as this unique statutory authority allows
ICE to acquire beds quickly and in remote locations where much of our
enforcement actions occur. While the acquisition of beds for family detention
through an IGSA may not be well understood outside the immigration
enforcement community, it is by no means improper or illegal.

**OIG Rebuttal:** We do not dispute ICE's general authority to use IGSAs to obtain beds in
detention centers and did not suggest that only standard FAR-based contracts be used to
procure detention beds. Additionally, we did not categorize all IGSAs as improper or illegal.
However, given the confusion within ICE over how to categorize IGSAs, ICE should have
developed policies and procedures for negotiating, executing, and modifying them.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

As the draft report correctly notes:  (1) ICE is responsible for the detention of removable aliens; and (2) ICE faced a major surge of families and unaccompanied minors crossing the Southwest border during 2014, which created an *urgent and compelling* need for family detention space.  The resolution of this crisis became a Secretary of Homeland Security priority, and the ICE Office of Acquisition Management (OAQ) used the contractual flexibilities afforded by its broad IGSA authority to meet this need.

ICE's IGSA authority is codified at 8 U.S.C. § 1103(a)(11)(A), which provides that the U.S. Department of Homeland Security (DHS) may enter into agreements with a State, or its subdivisions, "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by [ICE] pursuant to Federal law . . . ."  ICE relies on this authority for a significant number of its detention contracts.  Given this express authorization provided under federal immigration law, ICE has no legal requirement to compete the award of an IGSA because 8 U.S.C. § 1103(a)(11)(A) serves as an exception to the Competition in Contracting Act (CICA) requirement for full and open competition.  CICA provides that its competition requirements do not apply when "a statute expressly authorizes or requires that the procurement be made through another [executive] agency or from a specified source." 41 U.S.C. § 3301(a)(1).  Further, unlike the IGSA authority of the Department of Defense (DoD), 10 U.S.C. § 2679(a)(4), neither ICE nor the IGSA holder is required to competitively award any contracts or subcontracts awarded under the IGSA.[5]  Like DoD, ICE's IGSAs are not generally required to follow the Federal Acquisition Regulation (FAR).[6]

In addition, an IGSA is not a cooperative agreement.[7]  A cooperative agreement is used to transfer a thing of value to a State, local government or other entity, whereas a procurement contract is used when the principal purpose is to obtain services or property, by purchase, lease or barter, for the direct benefit

---

[5] Major Erik J. Zoll, *Intergovernmental Support Agreements: A Primer for the Field*, The Army Lawyer, (June 2017), at 43 (discussing how the DoD IGSAs are exempt from CICA); Michael J. Davidson, *CICA's Uncle Sam Exception*, 53 The Procurement Lawyer, 3, and 5-6 (Fall 2017) (discussing ICE IGSA authority and exemption from CICA).

[6] Zoll, *supra* note 1, at 42-43; Davidson, *supra* note 1, at 3, 5.  *See also Board of County Commissioners of the County of Bernalillo v. United States*, 93 Fed. Cl. 228, 234 (2010) (detention services in an intergovernmental contract between the office of the Federal Detention Trustee and Bernalillo County was not subject to the FAR); ICE Contracting and Acquisition Procedures (ICECAP) 07.08, *Inter-Governmental Service Agreements (IGSA)* ¶2(a) (Aug. 28, 2007).  Although not FAR-based, IGSAs are governed by law and regulations concerning the obligation and expenditure of appropriated funds and hence subject to the DHS Acquisition Manual and OMB Circular A-87, *Cost Principles for State, Local and Indian Tribal Governments*, codified at 2 C.F.R. part 225, which ICE OAQ uses when determining a bed-day rate.

[7] A July 30, 2014 unsigned memorandum from Song Kim, Acting Chief, Commercial and Administrative Law Division (CALD), OPLA, ICE, to Bill Weinberg, Director and Head of Contracting Activity, OAQ,  ICE, does not represent the longstanding views of OAQ and the OPLA that IGSAs are statutorily authorized as a contract vehicle available for acquiring detention services in support of the ICE immigration enforcement mission.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

or use of the United States.[8]  Despite the OIG's conclusion ICE has never defined IGSAs nor followed the FAR and or federal contracting guidelines contained in part 200 of Title 2 of the Code of Federal Regulations, both ICE OAQ and the Office of the Principal Legal Advisor (OPLA) have long taken the position that an IGSA is a type of procurement rather than a cooperative agreement.[9]

> **OIG Rebuttal:** No part of the report addresses the applicability of the Competition in Contracting (CICA) to IGSAs. In any event, ICE can decide whether to address the relationship between CICA and IGSAs as it develops policies and procedures for negotiating, executing, and modifying IGSAs.

The draft report cites two reasons why the OIG believes ICE improperly modified its IGSA with the City of Eloy, in Arizona:  (1) the terms of the IGSA were negotiated directly with Eloy's existing subcontractor CCA, instead of the party legally responsible for the agreement (Eloy); and (2) the addition of family detention services was outside the scope of the original IGSA.

ICE contends that the modification to the Eloy IGSA was proper.  ICE is statutorily authorized to utilize IGSAs for detention services, and IGSAs are exempt from both the CICA and the FAR.  Assuming the IGSA contracting partner consents, ICE is unaware of any legal prohibition against negotiating contractual terms with an IGSA subcontractor.  Further, given the non-applicability of CICA and the FAR, ICE is free to take advantage of the broad flexibilities afforded by its IGSA authority to modify the terms of the original agreement.  At the time of the IGSA modification, ICE was neither under a legal obligation to compete the detention contract within the commercial marketplace nor subject to the normal CICA/FAR requirements on modifications of contracts.  Therefore, ICE has authority to noncompetitively enter into an IGSA for detention services and to negotiate the IGSA terms directly with Eloy's subcontractor, CCA.  Further, the addition of family detention services was consistent with the scope, intent, and framework of the original IGSA.

---

[8] *See Assisted Housing Services Corp. et al.*, B-406738, et seq., 2012 CPD ¶ 236 (Aug. 15, 2010).

[9] See memorandum from Michael J. Davidson, Chief, CALD, OPLA, ICE, to William C. Randolph, Director and Head of Contracting Activity, OAQ, ICE, *Funding Intergovernmental Service Agreements*  1 n.1 (Feb. 7, 2013); ICECAP 07.08, *supra* note 2, at ¶ 2(a) ("IGSAs are not grants or cooperative agreements").

**OIG Rebuttal:** We do not dispute ICE's authority to solicit proposals for the South Texas Family Residential Facility or ICE's general authority to enter into agreements for the care and housing of detainees. However, we do contend that the South Texas Modification would not have qualified under 8 U.S.C. § 1103(a)(11)(A) because it was, in practical terms, an agreement made with a private company (CCA), not with a state, local, or tribal government. A contracting officer's memorandum to the file documents that ICE asked private companies, not the City of Eloy, to provide proposals for the South Texas facility. Any delegation of negotiation authority by the City of Eloy, located in another state, came after CCA was selected to meet ICE's need for additional detention beds. The City's meeting minutes demonstrate that the city was acting merely as a "fiscal agent" (i.e., middleman) for CCA.

As far back as 1999, the former Immigration and Naturalization Service (INS) utilized established acquisition procedures for entering into IGSAs for the same detention services.[10] These foundational guidelines continue to serve as an important part of the groundwork for the current ICE IGSA acquisition procedures outside of the FAR framework. As explained in Immigration and Naturalization Service Acquisition Procedures (INSAP) 04-02, in 1982 the Office of Management and Budget recognized the unique nature of the federal detention marketplace, and issued a memorandum to the Department of Justice authorizing the INS, the Bureau of Prisons, and the U.S. Marshals Service (USMS), to process jail agreements outside of the FAR. The INS relied on this memorandum until 1996, when statutory language was added to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,[11] authorizing the use of IGSAs for immigration detention. The ICE Contract and Acquisition Procedures (ICECAP) replaced INSAP, and on May 25, 2010, ICE issued ICECAP 10.08 R1, establishing updated policy and procedures for establishing IGSAs.[12]

By their very nature, detention center requirements are unpredictable and often urgent and compelling, and ICE's use of its unique IGSA authority to procure detention space operates differently from traditional FAR-based procurements. The scope of the detention center IGSA vehicle may be broad and/or in flux as requirements change, but the rigorous contracting procedures and leadership oversight applied to these procurements remain steadfast. To that end, ICE is always receptive to improving its acquisition procedures. ICE OAQ acquisition policies are contained in its legacy ICECAPs and the ICE Contracting Supplement. ICECAP 10.08 R1, *Inter-Governmental Service Agreements*, outlines the policies and procedures for negotiating and awarding an IGSA and is available as a guide for ICE OAQ employees to follow when negotiating an IGSA. As outlined in ICECAP 10.08 R1, ICE OAQ has a standard IGSA package for new IGSA awards that includes: the Jail Services

[10] INSAP-04-02, Acquisition Procedures for Inter-Governmental Service (Jail) Agreements (May 3, 1999).

[11] Pub. L. No. 104-208, 1120 Stat. 3009-546.

[12] The ICECAP was not applicable to Inter-Governmental Agreements awarded by the U.S. Marshals Service.




**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Cost Statement (JSCS), Performance Work Statement, Quality Assurance and Surveillance Plan, DHS Prison Rape Elimination Act, security requirements, multiple medical requirements, and the basic IGSA statement of work. The service provider is responsible for filling out the JSCS and submitting it to ICE to substantiate costs associated with providing detention services. The JSCS captures total personnel costs, total personnel benefits, total consultant and contract services, other direct operating costs, indirect costs, equipment depreciation costs, and building depreciation costs of the service provider for a given fiscal year. A formula within the JSCS then calculates the proposed bed day rate based on those costs. The completed JSCS is evaluated by the Contracting Officer in conjunction with the ICE/ERO Detention Planning and Acquisition Unit (DPAU) to determine allowable and unallowable costs and ultimately to decide whether the bed-day rate proposed is fair and reasonable based on the cost data supplied.

> **OIG Rebuttal:** We do not dispute ICE's need to respond to changing and sometimes unpredictable requirements. However, when asked for its policies on IGSAs, ICE personnel provided templates and checklists. When we specifically asked for the latest version of ICECAP 07.08 *Intergovernmental Service Agreements (IGSAs)*, ICE's Deputy Assistant Director for Acquisition Policy & Procedures said the ICECAPs were no longer ICE policy. Templates and checklists are not an adequate substitution for current written policy and procedures.

ICE OAQ executes detention center contracts and IGSAs in the best interest of the Federal Government, taxpayers, and detainees. Before an IGSA is awarded, ICE must conduct an analysis of possible detention space alternatives. This includes identifying whether any state or local detention facilities as well as any existing ICE IGSA or USMS Inter-Governmental Agreement, is available. The requirements are vetted and refined through multiple program offices within ICE before it reaches OAQ. After the requirement reaches OAQ, extensive negotiations occur between OAQ and the service provider until an acceptable agreement is reached. The service provider is required to submit documentation to the government to allow for input from the government's technical experts. This includes representatives from ICE's Enforcement and Removal Operations, including the DPAU and ICE Health Service Corps, and the ICE Office of the Chief Financial Officer, including the Office of Budget and Program Performance to ensure that ICE is obtaining services that represent the best value to the government, taxpayers and detainees. For this particular modification to the City of Eloy IGSA, several discussions were held with senior-level contracting leadership and ICE senior leadership to discuss concerns, assess risk, and identify the best path forward for this procurement.

The initial scope of the IGSA with the City of Eloy was for the housing, care, and security of persons detained by ICE, which aligns with ICE's statutory IGSA authority. The modification adding family detention services (Modification P00010) was well within the scope of the Eloy IGSA. The only



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

difference is that Modification P00010 would provide for the care of families (women and children) in accordance with the Family Residential Standards. Thus, Modification P00010 was a bi-lateral modification that expanded the population that would be detained from all males to include families, still within the initial scope of the Eloy IGSA. Even assuming Modification P00010 was deemed out-of-scope, the flexibilities associated with ICE's IGSA authority would have still permitted such a modification.

**OIG Rebuttal:** ICE had options, other than modifying the Eloy IGSA, such as a sole-source contract with CCA, executing a new IGSA with a locality closer to the facility, or modifying the IGSA of a closer locality. ICE did not justify its elimination of these options. We also contend that the modification was improper as it was outside the scope of the initial agreement both in form and in substance. Eloy has practically no oversight over a facility that was constructed 900 miles away.

In the case of the family detention IGSA with the City of Eloy, ICE OAQ has documented the negotiations and determined that the price was fair and reasonable using, as a guideline, the established contracting procedures of FAR Part 15 principles. As with any IGSA, the Contracting Officer made a determination of "fair and reasonable" price (which is a price that is fair to both the buyer and seller, given the requirement and current conditions). As the draft report recognizes, the contract was negotiated at a time when DHS was responding to an unprecedented border surge and ICE had an urgent need for additional detention services. ICE was able to obtain a reasonable price through negotiations with the vendor. Through four weeks of negotiations prior to award, ICE achieved price reductions and was able to eliminate some elements of risk. Although risk remained at the initiation of this contract due to circumstances surrounding large-scale border crossings at the time, as the risk has decreased over time OAQ has continued to explore opportunities for cost savings at this facility. In fact, a later bi-lateral modification (P00027) reduced the monthly firm-fixed price for 2,400 beds significantly. Given the unique conditions and requirements for family detention, the price ICE is paying for use of beds at this facility is fair and reasonable.

**OIG Rebuttal:** Unless ICE discontinues its current practice and establishes and communicates specific written procedures for IGSAs, ICE risks overpaying for detention services.

The Contracting Officer's Memorandum to File documents the background and rationale for modifying the existing IGSA with the City of Eloy to add family detention services at Dilley, Texas. In July 2014, OAQ issued a request for proposals to two vendors, GEO and CCA, for an up-to-2,000-bed facility to detain illegal alien families in ICE custody. Only CCA responded, offering a proposal to modify the IGSA with the City of Eloy. Under the Eloy IGSA, CCA is the service provider and responsible for providing the facility and detention services at the Eloy Detention Center. CCA operates as a sub-contractor on



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the Eloy IGSA and has a separate agreement with Eloy outlining its relationship with Eloy.  The City of Eloy authorized CCA to speak with ICE on behalf of Eloy as it relates to detention services provided under the IGSA.  After reviewing all the alternatives and discussions with OPLA, the Contracting Officer determined that modifying the Eloy IGSA to provide family detention services in Dilley, Texas, was not statutorily prohibited.

> **OIG Rebuttal:** The contracting officer's memorandum to the file does not provide a rationale for ICE's actions; rather, it simply documents events that took place. We do not dispute ICE's authority to solicit proposals for the South Texas Family Residential Facility or ICE's general authority to enter into agreements for the care and housing of detainees. However, we do contend that the South Texas Modification would not have qualified under 8 U.S.C. § 1103(a)(11)(A) because it was, in practical terms, an agreement made with a private company (CCA), not with a state, local, or tribal government. Despite the fact that the agreement was signed by a representative for the City of Eloy, the City's meeting minutes demonstrate that the city was acting merely as a "fiscal agent" for CCA. In its response to this report, ICE acknowledged that CCA was selected to provide detention services in south Texas **before** the Eloy IGSA was identified for modification.

The draft report contained two recommendations, one with which ICE concurs and one with which it non-concurs.  Attached find our detailed response to each recommendation.  Technical comments were previously provided under separate cover.

Thank you again for the opportunity to comment on this draft report.  Please feel free to contact me if you have any questions.  We look forward to working with you again in the future.

Attachment
- ICE Management Response to Recommendations Contained in 15-124-AUD-ICE



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Attachment: U.S. Immigration and Customs Enforcement (ICE) Management Response to Recommendations Contained in 15-124-AUD-ICE

OIG recommended that:

**Recommendation 1:**  The Deputy Director of ICE establish and communicate specific written procedures for Intergovernmental Service Agreements (IGSAs) implementing Federal guidelines that include:

   a.  A definition of an IGSA and determination of whether it is a cooperative agreement or procurement contract;

   b.  Administrative requirements for the solicitation and award of IGSAs;

   c.  Post-award requirements;

   d.  Guidelines for modifications, and;

   e.  Allowable cost structure.

**Response:**  Concur.  ICE's Office of Acquisition Management (OAQ) has established specific written procedures for negotiating, establishing, and administering IGSAs, but agrees that it will undertake an effort to ensure the procedures address each of the areas outlined in this recommendation, as appropriate.

It is important to recognize, however, that ICE Contracting and Acquisition Procedure (ICECAP) 07.08 defines an IGSA and discusses in detail ICE's authority to enter into IGSAs with non-federal government entities to house immigration detainees.  This guidance clearly states that an IGSA is not a cooperative agreement and makes it clear that IGSA are not acquisitions governed by the FAR.  Rather, IGSAs function as a form of fixed-price, indefinite quantity, indefinite delivery type contract, some of which include a monthly guaranteed minimum.

In addition, ICECAP 07.08 states the IGSAs are not usually competed; rather, ICE identifies an available non-federal government entity that could provide detention services, negotiates terms and a price for the services, and then enters into an IGSA.  It is the legal opinion of the ICE Office of the Principal Legal Advisor that IGSAs are exempt from the competition requirements of the Competition in Contracting Act (CICA) and the Federal Acquisition Regulation (FAR).

ICE has also established standard templates for IGSA solicitations including a streamlined Jail Services Cost Statement (JSCS) to ensure payment of a fair

Case 2:19-cv-01391-JJT-ESW   Document 11-2   Filed 04/08/19   Page 46 of 48



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

and reasonable price. The process for handling post-award requirements and modifications are included in the language of the standard IGSA template.

Further, ICECAP 07.08 states that IGSAs are subject to OMB Circular A-87, *Cost Principles for State, Local and Indian Tribal Governments*, codified at 2 C.F.R. § 225. The JSCS, previously discussed, calculates a bed-day rate based on allowable costs in a given fiscal year based on cost data supplied by the IGSA contracting partner. The JSCS template supplied to vendors also includes a certification statement acknowledging that costs prohibited by OMB Circular A-87 are not allowed to be charged.

Estimated Completion Date: April 30, 2018.

**Recommendation 2:** ICE discontinue modifying the Eloy IGSA to procure family detention space at the South Texas Family Residential Center and use the procedures developed in Recommendation 1 to procure necessary housing for family detention.

**Response:** Non-concur. ICE disagrees with the recommendation to discontinue modifying the Eloy IGSA for family detention services at the STFRC. ICE modified its IGSA with the City of Eloy to provide care and housing of families in ICE custody at the STFRC in Dilley, Texas, in accordance with the terms and conditions of its existing IGSA with Eloy. ICE has statutory authority at 8 U.S.C. § 1103(a)(11)(A) to procure detention services through IGSAs. IGSAs are not governed by the FAR or subject to the full and open competition requirements under CICA. In addition, ICE has written procedures and guidance about how to negotiate, establish and administer IGSAs, which were followed and are currently being reviewed and updated (in response to Recommendation 1), as appropriate. We request that OIG consider this recommendation resolved and closed.

*www.oig.dhs.gov*                    26                    OIG-18-53



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix D**
**Report Distribution**

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees
U.S. Senator Claire McCaskill

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305